UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GARY W. RICHARDS,
     Plaintiff,
v.                                                    CASE NO. 3:14-cv-1724 (VAB)

DIRECT ENERGY SERVICES, LLC,
     Defendant.

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Gary Richards, brings this putative class action against Direct Energy Services, LLC ("Direct Energy"), asserting claims that arise out of Direct Energy's business of supplying electricity to residential customers. Compl. ¶¶ 2-3, ECF No. 1. In his Complaint, Mr. Richards alleged that Direct Energy engaged in unfair and deceptive trade practices, in violation of the state unfair trade practices laws of Connecticut, the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110a, *et seq.*, and Massachusetts, the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen. Laws Ann. ch. 93A, §1, *et seq*. Compl. ¶ 54, ECF No. 1. He also made claims of unjust enrichment and breach of the covenant of good faith and fair dealing. *Id.* ¶¶ 57-63, 65-70.

In August 2015, the Court denied Direct Energy's motion to dismiss Mr. Richards's claims under CUTPA and the implied covenant of good faith and fair dealing. *See* Order, ECF No. 63. Now, Direct Energy has moved for summary judgment on the remaining claims. For the reasons that follow, the motion is GRANTED.

**I.    Factual Background**

This case concerns a relationship between a consumer, Mr. Richards, and Direct Energy, the company that sold him electricity 2014 and 2015. Like many states, Connecticut restructured its electricity market almost 20 years ago. *See* Report of Adamson and Macan of Charles River Associates, Decl. of Seth Klein, Ex. A, ECF No. 137-1 ("CRA Report"); Report of Neil Fisher,

1

Def.'s Mem., Ex. B, at II(A), ECF No. 119-2 ("Fisher Report"). This created "markets for wholesale and retail power where previously almost all decisions and prices had been closely regulated." CRA Report, 2.1.2. Connecticut's electric suppliers would, subject to limited oversight by the Public Utilities Regulatory Authority ("PURA"), offer electric service to customers at market rates. *Id.* Electricity customers in this deregulated landscape could select their supplier and enter into contracts for electricity service. *Id.*

Suppliers, like Direct Energy, sell power rather than generate it. The electricity that powers Connecticut's households is generated at high-voltage power plants and then pooled by the Independent System Operator ("ISO") New England. *See* Hay Dep., Decl. of Seth Klein, Ex. D, ECF No. 137-4, 11: 3-23; CRA Report, 1.5. This energy is distributed to local utilities and then to energy suppliers, who pass it on to consumers. Hay Dep., 13: 4-8. In other words, Direct Energy is a "middleman" in the state's electricity market: it purchases energy from suppliers or wholesalers and contracts with consumers to sell it to them at a certain price. *Id.*

All of Direct Energy's Connecticut consumers are charged one of two rates—the "fixed rate" or the "variable rate." This case concerns how Direct Energy sets its variable rates.

Initially, Direct Energy offers Connecticut customers "fixed rate" contracts, where the rate that the customer pays for energy is fixed for a certain term, usually between twelve and thirty-six months. Hay Dep., 37-38. At the end of the initial term, if the customer does not sign up for a new fixed rate contract, the customer's rate becomes "variable," meaning that it can change monthly. *Id.* According to James Hay, General Manager of U.S. Energy for Direct Energy, for fixed rate contracts, Direct Energy purchases power up to twelve months in advance. *Id.* at 15. For variable rate contracts, however, Direct Energy purchases power several months in advance. *Id.* at 16-19.

In early 2012, Mr. Richards signed up for a one-year fixed-rate electricity plan with Direct Energy. Def.'s L. R. 56(a) Stmt. ¶ 9. Under this plan, Mr. Richards would pay a fixed price for a year and then switch to the variable rate. The resulting contract stated that:

> After the Initial Term and during the Renewal Period, the rate for electricity will be variable each month at Direct Energy's discretion. The rate may be higher or lower each month based on business and market conditions.

Compl. ¶ 34 (the "Evergreen Clause"). Every variable rate contract includes this language. *See id.*

When Mr. Richards signed up for this plan, he knew about the application of the variable rate after the fixed rate expired. *See* Richards Dep., Def.'s Mot., Ex. A, ECF No. 118-4, at 46:7-48:6 ("All the energy suppliers that supplied third-party energy have a fixed and variable rate, so it was my assumption that Direct Energy was the same"). In April 2013, Mr. Richards's fixed rate expired and Direct Energy raised his electricity charges. Compl. ¶ 34. Mr. Richards paid the variable rate for three billing cycles and then switched to a different electricity service provider in August 2013. Def.'s L. R. 56(a) Stmt. ¶ 19.

Mr. Richards selected Direct Energy because of the "fixed rate price" and the fact that Direct Energy charged "no termination fee." *See* Richards Dep. 48:22–49:8 ("Q. When you decided to sign up with Direct Energy, what were the factors that you considered? A. Price. Q. Fixed rate price? A. Fixed rate price, no termination fee. Q. Anything else? A. No."). When asked if Direct Energy had made a misrepresentation to him, Mr. Richards replied that "I'm not sure what anybody represented to me or said to me that was wrong or misleading." *Id.* at 18:3-23 ("Q. Tell me, if you would, everything that you believe Direct Energy represented to you that was misleading. A. At the time that I signed up, my expectation was that I would shop for another provider at the end of the initial period or their fixed rate period, so to answer your question, I'm not sure what anybody represented to me or said to me that was wrong or misleading.")

## A. Direct Energy's Pricing Strategy

This lawsuit concerns the prices that Direct Energy charges to fixed and variable rate customers and the margin of profit it makes from each. The company considers a variety of factors when setting the prices it charges to consumers. Mr. Hay, the General Manager, said that Direct Energy set an internal target gross margin for fixed rate customers, although he noted that the target

3

varies by the length of the term of the customer's fixed rate contract.  Hay Dep., 49: 23-25; 51:6-52:2.  When it set that target, Hay testified, part of Direct Energy's goal was to "churn less," or to encourage customers to continue using Direct Energy's services.  *Id.* at 53:23-25; *see also id.* at 56:1-8 (agreeing to question: "for your fixed price contracts, do you – in Connecticut for example, do you offer lower priced fixed price arrangements in order to capture new customers?").

For variable price customers, the target margin was much higher.  According to Mr. Hay, Direct Energy expected to earn nearly three times as much per megawatt hour from customers with these contracts.  *Id.* at 73:5-6.  Direct Energy determined the specific target margin based on the projected "customer churn," the cost of energy on the wholesale market, and other incidentals. *Id.* at 73:9-13.  Mr. Hay also testified that Direct Energy would sometimes increase the target margin on the variable rate to make up for lost profits from other variable rate customers at other points, but not to make up for losses from the "fixed book."  *Id.* at 80: 13-25. Mr. Hay also agreed, however, that "if [Direct Energy] lost money … on the megawatt hour margin when people rolled over from the fixed book to the variable book and the margin moved [up, it was] able to recoup some of the prior losses [from customers] when they were on the fixed price book."  *See* Hay Dep., 102: 1-5.  Generally, Direct Energy's variable rates often changed, and were always higher than the standard service rate.  Fisher Dep., Klein Decl., Ex. H, at 90:20-92:17 (agreeing that "in every month from June of 2013 to August of 2015 Direct Energy's variable price was higher than CL&P's standard rate.").

### B.  Mr. Richards' Expectations

Mr. Richards alleges that Direct Energy was wrong to seek more profit from variable rate customers than it did from fixed rate customers.  He argues that the difference in Direct Energy's target profit margins for the two types of customers reflected a desire to let the variable rate customers "subsidize" the fixed rate customers, who were charged a "teaser" rate that would lure them into business with Direct Energy.  Pl.'s Mem., 31.

Mr. Richards claims that, by employing this pricing strategy, Direct Energy abused the discretion that it was given in the Evergreen Clause, which allowed it to vary rates according to "business and market conditions." Mr. Richards testified that, in his expectation, "market conditions" would "have to do with the wholesale rate and competitor's pricing" and business conditions "shouldn't be … variable." Richards Dep., 71: 19-25; 72:2. Mr. Richards expected that "the variable rate would be based on business practices and market conditions," and that Direct Energy would be "looking out for [his] best interests" by changing the variable rate in accordance with the company's costs. Richards Dep., Ex. F, 99: 4-11 ("So I would have to say that, yeah, if their costs go down, [the variable rate would] reflect the savings. If their costs go up, you don't necessarily have to increase at the same rate, and you certainly don't have to increase at a higher rate."). Generally, Mr. Richards expected "that the variable rate shouldn't be an exorbitant rate above and beyond what the standard rate is." *Id.* at 10:10-12.

Mr. Richards submitted a report from expert witnesses to supplement his theory about why Direct Energy's rates were unfair. Seabron Adamson and Edo Macan of Charles River Associates ("CRA"), who have decades of experience consulting with energy companies, wrote the report on his behalf. CRA Report at § 1.1. These experts argue that, for a "middleman" like Direct Energy, a rate consistent with business and market conditions would include "the costs of procuring power on the wholesale market, plus an appropriate margin to cover the legitimate costs and risks of supplying variable rate customers," including overhead costs, like marketing and personnel charges, which are generally fixed. *Id.* at § 3.3.

Plaintiff's experts compare Direct Energy's the expected profit margin from the fixed rate customers to the margins that the company made from variable rate customers. CRA Report, § 3.4. They conclude that Direct Energy enjoyed a greater profit margin from variable rate customers for most of the approximately two-year period that they studied, except during the winters of 2013-14 and 2014-15, when energy prices grew more than the variable rate did. *Id.* These experts reviewed

the risks associated with providing energy to variable rate and fixed rate customers, including

"customer churn," changes in weather, overhead, and changes in energy costs. They concluded that

Direct Energy faced most of the same risks in serving its fixed rate and variable rate customers.  *Id.*

at 3.5.1.4.  They concluded, therefore, that the "very large gap" between the company's profit margin

on variable rate customers and its profit margin on fixed rate customers was not "explainable by

apparent increased risks for serving variable rate customers."  *Id.*

Instead, they argue, Direct Energy looked to make very high profit margins from its variable

rate customers and, with limited modifications to prevent churn during cold winter months, set prices

accordingly.  Their goal was to "extract[] rents" from variable rate customers that they did not extract

from customers on the fixed rate book.  CRA Report, § 3.5.1.4.  The experts concluded that this is

not a "business or market condition" that Direct Energy should have considered when setting prices.

Plaintiff's experts then calculated damages by assessing the amount that Direct Energy should have

charged its variable rate customers, using the company's target margin for fixed-rate customers as a

benchmark. *Id.* at § 4.2.

Direct Energy disagrees with the premise of Mr. Richards's argument as well as his

calculation of damages.  Direct Energy submitted a report from an expert, Mr. Neil Fisher, who is

Principal of the NorthBridge Group, Inc., a consulting firm that specializes in electric and gas

companies.  *See* Fisher Report, p. 2.  Mr. Fisher concluded that the variable rates were consistent

with business and market conditions and fluctuated with changing prices of competitors.  *Id.* at III.A.

Mr. Fisher argued that Mr. Richards improperly used Direct Energy's target margin for its fixed rate

customers as a standard for the appropriate or acceptable target margin for the variable rate book of

business.  *Id.* at II.C(1) ("In effect, the CRA Report proposes a new standard that asks the court to

determine Direct Energy's legitimate business costs, however defined, for each product that Direct

Energy provides and then have the court regulate Direct Energy's pricing by establishing an

'acceptable' or 'appropriate' gross margin for each product.").  Mr. Fisher eventually concluded that

"business and market conditions" would include a company's desire to set different profit margins for each of its products. *Id.* Furthermore, Mr. Fisher emphasized that Direct Energy's variable rate customers were free to "return to Standard Service Rates at any time," and suggested that Mr. Richards "could have easily avoided" the harm he alleges if he renewed or terminated his agreement when the fixed price expired. Fisher Rept., A(7).

### C. Variable Rates and the Wholesale Rate

Mr. Richards argues that "Direct Energy's variable rate goes up as its wholesale cost of power increases, but then remains elevated regardless of dramatic changes in business and market conditions." Pl.'s Opp. Mem., 1 (citing CRA Report §§ 3.4, 3.5; Rebuttal Report § 2.4). To support this contention, he cites the report of his experts, who made certain conclusions about Direct Energy's variable rates. In their first report, the experts concluded that Direct Energy's "gross margins on variable rate customers were much higher than the … benchmark" that the company set for fixed rate customers. CRA Report, § 3.4. They also reviewed the company's profit margins on variable rate customers and how they changed over time, noting that profit margins on variable rate customers fell during the "polar vortex" in early 2014, but after the vortex, "as market prices fell, [Direct Energy]'s total profits on variable rate customers rose again sharply." *Id.* at § 3.4. The experts concluded, when challenging Mr. Fisher's contention that Direct Energy's variable prices were more stable than the cost of the company's supplies, that: (1) "beginning in February 2014, Direct Energy's variable price became 'stable' at a price that was approximately 50% more than it was in the summer of 2013; and (2) the variable rate charged did not reflect the rapid decrease in wholesale prices and Direct Energy's supply costs after the winter of 2013/14." CRA Rebuttal Report, Klein Decl., Ex. B, ECF No. 137-2, at § 2.4 ("CRA Rebuttal Report").

The parties also dispute the relationship between Direct Energy's variable rates and those of other companies. Mr. Fisher compared Direct Energy's variable price with "other competitive supplier prices," concluding that "during this 27 month period, there was an 83% correlation between

Direct Energy's variable prices and the average of other competitive supplier prices." Fisher Report, III.B.  Mr. Richards seeks to preclude this part of Mr. Fisher's report because Mr. Fisher did not provide information in his report the accompanying initial disclosures about the statistical significance of his conclusions.  *See* Motion to Exclude Portions of Testimony of Defendant's Expert, ECF No. 156.[1]  In a rebuttal report, Plaintiff's experts challenged Mr. Fisher's comparison between Direct Energy and its competitors.  They argued that Mr. Fisher's conclusions are "virtually meaningless" because he relied on the average high and low prices each competitor offered without factoring in how many customers pay each price.  *See* CRA Rebuttal Report, § 2.2.

Mr. Richards's experts also re-assessed Mr. Fisher's data to show the difference in average prices (using the disputed data on price averages), rather than the indexed scale that Mr. Fisher used, which reflected only differences in how the prices changed over time.  The experts concluded that Direct Energy "generally charged higher rates than its competitors," but also noted that "competitors' retail prices … do not seem germane to the contract matter at dispute here."  *Id.* ("We also did not, and do not feel, that this comparison was relevant to the contractual dispute in this case.").

### D.  Procedural Background

Mr. Richards filed his Complaint in November 2014.  In his Complaint, Mr. Richards claimed that he "reasonably interpreted [the Evergreen Clause] to mean that Direct Energy's variable rates track the underlying wholesale power rates" on ISO New England's wholesale market.  Compl. ¶ 36.  He further alleged that "a reasonable consumer" would interpret the Evergreen Clause to mean that the plan's rates would rise and fall with the wholesale market rates. *Id.* ¶ 26.  Instead, Mr. Richards alleged, Direct Energy charged variable rate customers artificially high rates for their electricity.  *Id.* at ¶¶ 27-28.  More importantly, these prices did not decrease when wholesale prices fell.  *Id.*  In his Complaint, Mr. Richards indicated that he would seek to certify a class consisting of

---

[1] In deciding this motion, the Court merely notes this challenged information, but does not rely on it.  In any event, because of the outcome reached herein, this motion to preclude will become moot.

"[a]ll persons enrolled in a [Direct Energy] variable rate electric plan in connection with a property located within Connecticut and Massachusetts." *Id.* ¶ 38.

In his Complaint, Mr. Richards alleged that Direct Energy's pricing scheme violated CUTPA and the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen. Laws Ann. 93A, §1, et seq. *See* Compl. ¶ 54, ECF No. 1. He also made claims of unjust enrichment and breach of the covenant of good faith and fair dealing. *Id.* ¶¶ 57-63, 65-70.   On January 11, 2015, Direct Energy moved to dismiss the Complaint.

On August 4, 2015, the Court granted Direct Energy's motion to dismiss two of Mr. Richards's four claims. *See* Order, ECF No. 63.  The Court held that Mr. Richards did not have standing to bring his claim for a violation of Massachusetts's consumer protection law because he had not been injured in Massachusetts, and dismissed that claim for lack of jurisdiction. *Id.* at 1. The Court also dismissed Mr. Richards's unjust enrichment claim. *Id.*  The Court denied Direct Energy's motion to dismiss Mr. Richards's claims under CUTPA and the implied covenant of good faith and fair dealing. *Id.*

When considering Mr. Richards's CUTPA claim, the court noted that the "the question [wa]s a close one," but held that Mr. Richards had stated a claim for a violation of CUTPA.  He had alleged that "one possible and reasonable understanding of [Direct Energy]'s contract, and in particular the term 'business and market conditions,' was that [Direct Energy]'s energy prices would reflect the wholesale market rates to some unknown extent."  Order, 16.  Mr. Richards had also alleged that variable rates "were significantly higher than the wholesale market rates and did not always increase or decrease when the wholesale market rates did."  *Id.* at 17.  The combination of these allegations, the Court concluded, were sufficient to state a claim for a violation of CUTPA.  *Id.*

The Court also found that these allegations also stated a claim for the breach of the implied covenant of good faith and fair dealing.  *Id.* at 25 ("Mr. Richards plausibly alleges that consumers

reasonably understood that DES's variable-rate plan prices would reflect the wholesale market price in some way [while] failing to actually do that in practice.").  The Court noted that "while the contract left the price open to be set at DES's discretion, the covenant of good faith and fair dealing requires that DES exercise that discretion reasonably by charging a commercially reasonable price." *Id.* at 26.

## II.    Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that no genuine issues of material fact remain in dispute and that it is thus "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law" and a factual issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the record, this Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citations omitted).  If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is inappropriate.  *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Anderson*, 477 U.S. at 250 (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict").  In determining whether summary judgment is appropriate, the Court must consider only admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence") (citation and internal quotation marks omitted); Fed. R. Civ. P. 56(e).

### III.   Discussion

#### A.   Changes to Mr. Richards's Theory of Liability

In moving for summary judgment, Direct Energy first argues that Mr. Richards has impermissibly changed his theory of liability without amending his Complaint.  Because of this, it suggests, the Court's "inquiry should be limited to the … [t]heory that Richards alleged in his Complaint."  Def.'s Mem., 13.  The Court disagrees.

As Direct Energy argues, the Court may not consider "unpleaded allegations" in its ruling on a motion for summary judgment.  Def.'s Mem., 13 (citing *Derisme v. Hunt Leibert Jacobson P.C.*, 880 F. Supp. 2d 339, 376 (D. Conn. 2012)).  In *Derisme*, the court refused to consider the "entirely new" allegations that the plaintiff made in her opposition to summary judgment, concluding that "a party may not use his or her opposition to a dispositive motion as a means to amend the complaint." *Id.* (citing *Shah v. Helen Hayes Hosp.*, 252 Fed. App'x. 364, 366 (2d Cir.2007)).  There, the plaintiff sought to add entirely new theories of liability under the Fair Debt Collection Practices Act ("FDCPA").  It alleged for the first time that the defendant had fraudulently created an assignment and several documents, which were different FDCPA violations from the ones she alleged in her complaint.  *Id.*   In *Shah*, which Direct Energy also cites, the Second Circuit found that the district court did not err by refusing to consider two new claims that Mr. Shah invoked in his response to summary judgment.  *Shah*, 252 Fed. App'x. at 366.  The court concluded that the district court's refusal was proper because Mr. Shah's new claims—for violations of the Fifth and Fourteenth Amendments—should have been introduced as amendments to his complaint. *Id.*

Here, Direct Energy argues that Mr. Richards impermissibly changed his theory of liability by switching the "benchmark" against which he measures the variable rate to determine whether variable rate prices properly tracked "business and market conditions."  Def.'s Mem., 13.  In his Complaint, Mr. Richards argued that the variable rates should have tracked wholesale rates.  Now, Mr. Richards uses the fixed rate as his benchmark.  He argues that Direct Energy violated the

Evergreen Clause by setting its expected variable rate margin much higher than its expected profit margin on its fixed rate book, seeking to recoup losses from fixed rate customers.

By changing the benchmark he uses to evaluate Direct Energy's variable rates, Mr. Richards has not made "unpleaded allegations," *Derisme*, 880 F. Supp. 2d at 376, or "raised [new] claims," *Shah*, 252 Fed. App'x. at 366.  He continues to allege that Direct Energy used factors that were unrelated to "business and market conditions" to set variable rates, in violation of a reasonable understanding of the Evergreen Clause.  While his retreat from the "wholesale market theory," Def.'s Mem., 14, is fairly obvious, this does not mean that the Court cannot hear the new theory at all.  *See, e.g. Fuller v. Armstrong*, No. 3:00CV00812(RNC), 2004 WL 2808700, at *2-3 (D. Conn. Dec. 2, 2004), *aff'd*, 204 F. App'x 987 (2d Cir. 2006) (considering plaintiff's submission in opposition to the motion for summary judgment, even though it "plainly show[ed]" that she was pursuing a new "theory of her case," but concluding that "this new claim does not raise a genuine issue of material fact for trial.").

Furthermore, Mr. Richards raised these points in his motion to certify a class, and his experts alluded to the "cross-subsidization" theory in the report that was attached to that motion.  This gave Direct Energy notice of Mr. Richards's new theory and even enabled Direct Energy to prepare its own expert report in rebuttal.  Because the early notice lessened the element of surprise or prejudice to Direct Energy, the Court is further reassured that it should consider Mr. Richards's slightly changed argument.  *See Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 311 (N.D.N.Y. 2013) (noting that "a plaintiff may not raise new claims or theories of liability for the first time in opposition to summary judgment," but also that "[h]ere, Defendants had the requisite notice that Plaintiff was, or might well be, pursuing a claim based on her demotion.")

### B.  Mr. Richards's Claims under CUTPA

Direct Energy also seeks summary judgment on Mr. Richards's CUTPA claims.  Mr. Richards argues that Direct Energy violated CUTPA because it was "deceptive" and because it's

pricing scheme "amounted to a violation of public policy."  Pl.'s Opp. Mem., 27.  Direct Energy

argues that Mr. Richards has failed to raise a genuine issue of material fact.  *See* Def.'s Mem., 17-23.

The Court agrees.

CUTPA prohibits the use of "unfair or deceptive acts or practices in the conduct of any trade

or commerce." Conn. Gen. Stat. § 42-110b(a). The statute "provides a private cause of action to [a]ny

person who suffers any ascertainable loss of money or property, real or personal, as a result of the

use or employment of a [prohibited] method, act or practice." *Harris v. Bradley Mem'l Hosp. &*

*Health Ctr., Inc.*, 296 Conn. 315, 351 (2010). CUTPA claims may be based on either an "actual

deceptive practice" or an unfair practice—that is, a "practice amounting to a violation of public

policy." *Ulbrich v. Groth*, 310 Conn. 375, 409 (2013).

 "A violation of CUTPA may be established by showing either an actual deceptive practice

… or a practice amounting to a violation of public policy."  *Daddona v. Liberty Mobile Home Sales,*

*Inc.*, 209 Conn. 243, 254, 550 A.2d 1061 (1988); *Wilkins v. Yale University*, 2011 WL 1087144, *4

(Conn. Super. Ct. 2011) ("A subset of unfair practices, recognized by our Supreme Court, is

deceptive practices").  Because CUTPA is a self-avowed "remedial" measure, *see* Conn. Gen. Stat. §

42-110b(d), it is construed liberally in an effort to effectuate its public policy goals.

### 1. Deceptive Acts or Practices

Direct Energy argues that it is entitled to summary judgment on Mr. Richards's

misrepresentation claim because the record contains no "proof that Richards interpreted the

Evergreen Clause reasonably."  Def.'s Mem., 20.  Direct Energy further argues that the alleged

misrepresentation was not material.  *Id.*  The Court disagrees with both arguments, but concludes that

summary judgment is appropriate on this claim because the Evergreen Clause did not misrepresent

Direct Energy's eventual pricing strategy.

Three conditions must be met for an act or practice to be deceptive under CUTPA. "First,

there must be a representation, omission, or other practice likely to mislead consumers; second, the

consumers must interpret the message reasonably under the circumstances; and, third, the misleading

representation, omission, or practice must be material—that is, likely to affect consumer decisions or

conduct." *Southington Sav. Bank v. Rodgers*, 40 Conn. App. 23, 28 (1995) (citing *Caldor, Inc. v.

Heslin*, 215 Conn. 590, 597 (1990), *cert. denied*, 498 U.S. 1088 (1991)).  Deception under CUTPA

includes a broader range of conduct than common-law claims for fraud or misrepresentation and does

not require proof of intent. *Muniz v. Kravis*, 59 Conn. App. 704, 713, 757 A.2d 1207 (Conn. App.

2000).

Connecticut courts assess the deceptive impact of a practice with reference to customers

without "economic sophistication." *Murphy v. McNamara*, 36 Conn. Supp. 183, 190, 416 A.2d 170,

175 (Super. Ct. 1979) ("The act must be applied to protect the unthinking, the unsuspecting and the

credulous as well as the sophisticated."); *Hinchliffe v. Am. Motors Corp.*, 39 Conn. Supp. 107, 120-

21, 471 A.2d 980, 987 (Super. Ct. 1982), *aff'd* 192 Conn. 252 (1984) ("The standard utilized by the

court for determining whether the defendants' [promotional statement] would have a deceptive

impact on a consumer, is the standard applicable to an unthinking, ignorant and credulous person.").

In *Hinchliffe*, the Superior Court held that an interpretation was unreasonable when it the plaintiff's

reading of the term "four-wheel drive" was highly "patently absurd": that it would give the car the

"ability under any and all tractive circumstances, regardless of the weather, to move the vehicle when

only one wheel had traction." *Id.* at 119.  Instead, the court concluded that the defendant's evidence

indicated that there was an established scientific definition of the meaning of "four-wheel drive."

*See id.*

In this case, too, the phrase "business and market conditions" is susceptible to clear

interpretation.  Direct Energy argues that "the allegedly deceptive contract language—which stated

that Direct Energy would set the variable rate based on "business and market conditions"—

accurately disclosed the factors that might cause rate fluctuations."  Def.'s Mem., 6.  In other words,

it argues, "the factors Direct Energy allegedly considered in setting rates were legitimate 'business and market conditions' under any reasonable understanding of those words." *Id.*  The Court agrees.

When it denied Direct Energy's motion to dismiss, the Court expressly noted that the "question [was] a close one," but concluded that Mr. Richards's allegations, if true, could state a plausible claim for relief under CUTPA.  At this stage, after discovery, Mr. Richards, however, has not produced evidence to support a valid claim.

Mr. Richards's experts opine that "as market prices fell, [Direct Energy]'s total profits on variable rate customers rose again sharply."  *Id.* at § 3.5.13.  In their rebuttal report, the experts assessed prices more squarely and concluded that: (1) "beginning in February 2014, Direct Energy's variable price became 'stable' at a price that was approximately 50% more than it was in summer 2013; and (2) the variable rate charged did not reflect the rapid decrease in wholesale prices and Direct Energy's supply costs after the winter of 2013/14."  Rebuttal Report, § 2.4.  This conclusion is informative, but it is not a sufficient basis from which a jury could enter judgment on Mr. Richards' behalf.  Indeed, while the variable rate "did not reflect the rapid decrease in wholesale prices," it still moved up and down, at one point dipping below Direct Energy's supply costs in the winter of 2015. *See* Rebuttal Report, Fig. 3.

In any event, Mr. Richards and his experts emphasize a slightly different argument.  Rather than focusing on the relationship between the variable rates and the wholesale rates, Mr. Richards highlights the differential treatment of fixed and variable rate customers.  He argues that Direct Energy's pricing strategy was devoted to achieving its target profit margin on variable rate customers—which was several times higher than the profit margin it sought from its fixed rate book—rather than "business and market conditions."  Pl.'s Mem., 6 (describing Direct Energy's "gouging strategy").  As Mr. Richards's experts concluded:

> Retailers such as DES must charge some margin on their Variable Rates sales to cover their legitimate costs of doing business. We have used data available in DES's documents obtained in discovery to analyze the margins charged to Variable Rate

> customers by DES. DES targets a margin on sales to its Variable Rate customers that
> is approximately three times the margin charged to its core fixed price customers. By
> its own admission, DES manages its Variable Rate book of business solely to
> minimize the churn on this set of customer accounts – e.g. so that sufficient Variable
> Rate customers will stick around to be charged margins in the future.

CRA Report, § 1.5.  Mr. Richards's experts further concluded that the phrase "business and market

conditions … should be interpreted as a rate that is consistent with the costs of procuring power in

the wholesale market, plus an appropriate margin to cover the legitimate costs and risks of supplying

Variable Rate customers."  *Id.* at § 3.3.

Mr. Richards expands on this explanation in his opposition to summary judgment, concluding

that the Evergreen Clause "constituted a promise that Direct Energy's variable rate would vary based

upon its own costs in procuring that power, the only business and market condition related to

Defendant's fulfillment of its variable rate obligations under the contact that fluctuated to a material

extent."  Pl.'s Opp. Mem., 3.  Mr. Richards argues that Direct Energy's pricing strategy, which was

"driven by Direct Energy's desire to make up teaser rate low margins on the backs of variable rate

customers," was not a "business or market condition[] concerning performance of the variable rate

contract terms."  *Id.* at 6.

The plain language of the Evergreen Clause, however, reads differently.  Mr. Richards

suggests that the phrase "business and market conditions" obligates the company to make only an

"appropriate margin" on its variable rate customers.  *See* CRA Report, § 3.3.  The Evergreen Clause,

however, by giving Direct Energy the discretion to vary rates according to "business and market

conditions," gave the company the discretion to set a profit margin of its choosing when determining

variable rates.  No reasonable fact finder could conclude that the phrase "business and market

conditions" implied a particular profit margin.  Furthermore, the phrase cannot be read to require the

company to "set its variable rates based upon the 'business and market conditions' *relevant to*

*serving its variable rate customers*."  Pl.'s Opp. Mem., 1 (emphasis in original).  The "business and

market conditions" affecting Direct Energy would include the company's decision to seek different profits on variable rates than it sought from other products.

Mr. Richards argues that "subsidizing low fixed rates (designed to attract customers) by charging high variable rates (once they're reeled in) has nothing to do with the "business and market conditions" from a reasonable consumer's perspective."  Pl.'s Mem., 7.  The Court disagrees.

While there may be genuine issues about how the "general populace" would precisely define the phrase "business and market conditions," *see Hinchliffe*, 39 Conn. Supp. at 123, no reasonable fact-finder could conclude that the phrase required Direct Energy to have a specific profit margin, or to have the same profit margin for each product the company sold.[2] Direct Energy's pricing practices may be troubling, but they are not outside of the broad definition of "business and market conditions."  No reasonable jury would conclude that Direct Energy's pursuit of a desirable profit margin was not a "business and market condition."[3]

In this case, the sole misrepresentation that Mr. Richards's claims to have experienced is derived from the Evergreen Clause and its use of the phrase "business and market conditions."  Mr.

---

[2] *See, e.g. 11 little-known facts about Costco, where shoppers come for the pizza and stay for the diamonds*, Jul. 29, 2016, BUSINESS INSIDER, http://www.businessinsider.com/11-little-known-facts-about-costco-2016-7 (referencing Costco's offering snacks at a loss to lure customers past the food court); *Fast Food Chains Are Desperate to Kill the Dollar Menu*, Jan. 14, 2014, TIME, http://business.time.com/2014/01/14/fast-food-chains-are-desperate-to-kill-the-dollar-menu (referencing McDonald's charging less for its "Dollar Menu" than other food items); Todd J. Zywicki, *The Economics of Credit Cards*, 3 CHAP. L. REV. 79, 107 (2000) (describing "teaser" rates used by credit card companies).

[3] In reaching this conclusion, the Court is not commenting on the language of other energy contracts or even other pricing schemes not before it.  *See e.g.* Am. Compl. ¶ 38, Sanborn v. Viridian Energy, Inc., No. 3:14-cv-01731-SRU (D. Conn. 2014) (alleging that Viridian's Connecticut and New York Terms of Service state that the variable rate "may fluctuate each month based on the wholesale market conditions applicable" in the customer's area."); Am. Compl. ¶ 50, Steketee v. Viridian Energy, Inc., No. 3:15-cv-00585-SRU (D. Conn. 2015) (alleging that "Viridian, through one of its direct-marketing associates who used Viridian's uniform marketing materials convinced the Mirkins that Viridian's green energy was less expensive than conventional energy and was competitively-priced."); *Claridge v. N. Am. Power & Gas, LLC*, 2015 WL 5155934, at *4 (S.D.N.Y. Sept. 2, 2015) (denying motion to dismiss when contract's reference to "variable market based rate" included a reference to a "method stated above" when no such method was described); *Zahn v. N. Am. Power & Gas*, LLC, 847 F.3d 875, 877-78 (7th Cir. 2017) (noting that consumer had stated a claim for a breach of contract or a deceptive business practice because "she alleged that the teaser rate NAPG offered her was $.0499 per kilowatt hour and that she never received that initial rate.").

Richards only puts forth evidence related to profit-making.  Without more, a reasonable jury could not conclude that CUTPA had been violated.

### 2.  Unfair Acts or Practices

Mr. Richards also claims that Direct Energy's pricing practices were unfair and violated public policy.  Direct Energy disagrees, arguing that the Evergreen Clause "deceived no one."  Def.'s Mem., 20.  The Court agrees with Direct Energy.

"Persistent misrepresentation[s]," can be considered "unfair practices" under CUTPA's expansive language. *Milford Paintball, LLC v. Wampus Milford Associates, LLC*, 156 Conn. App. 750, 758 n.5, 764-66, 115 A.3d 1107, 1111 (2015), *cert. denied*, 317 Conn. 912 (2015) ("persistent misrepresentations" deemed immoral, unethical or unscrupulous under the Cigarette Rule, and thus analyzed as unfair acts or practices, rather than as deceptive acts or practices); *see also D'Amico v. LA Fitness*, No. FSTCV126013564S, 2013 WL 6912912, at *6 (Conn. Super. Dec. 2, 2013) ("The weight of authority in Connecticut holds that misrepresentations in the formation of a contract can be sufficiently aggravating circumstances to satisfy the requirement that such actions or omissions are immoral, unethical, oppressive or unscrupulous.").

In support of his claims under CUTPA's prohibition of generic unfair trade practices, Mr. Richards explains that "[f]ailing to follow the pricing methodology set forth in the contract would constitute 'immoral, unethical, oppressive or unscrupulous behavior.'"  Pl.'s Opp. Mem., 21 (citing *Richards v. Direct Energy Services LLC,* 120 F. Supp. 3d 148, 159 (D. Conn. 2015) (Bolden, J.)). Because Mr. Richards has not provided evidence that Direct Energy failed to base its pricing decisions on "business and market conditions," the Court grants summary judgment on this claim, as well.

A practice can violate CUTPA's "unfairness" prong, however, even if it is not a misrepresentation.  *Ulbrich*, 310 Conn. at 409 ("[A] violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public

policy."). A practice can be unfair if it violates the "cigarette rule" adopted by the Federal Trade

Commission, which looks to:

> (1) whether the practice, without necessarily having been previously considered
> unlawful, offends public policy as it has been established by statutes, the common
> law, or otherwise—in other words, it is within at least the penumbra of some
> common law, statutory, or other established concept of unfairness; (2) whether it is
> immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial
> injury to consumers, [competitors or other businesspersons].

*Conaway*, 464 A.2d at 852 (1983) (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233

(1972)). All three criteria do not need to be satisfied to support a finding of unfairness. "A

practice may be unfair because of the degree to which it meets one of the criteria or because

to a lesser extent it meets all three." *Ramirez v. Health Net of Northeast, Inc.*, 285 Conn. 1,

17 (2008) (internal quotation marks and citation omitted).

   The issue of whether a business practice is unfair generally "presents a question of fact."

*DeMotses v. Leonard Schwartz Nissan, Inc.*, 22 Conn. App. 464, 466 (1990). In this case, however,

Mr. Richards points to no cases where a court found a business practice violated CUTPA's

unfairness prong on account of its pricing practices alone. At oral argument, Mr. Richards's counsel

mentioned one case—*Votto v. American Car Rental, Inc.*—where a defendant's high prices

constituted an "unfair trade practice" under CUTPA. *See Votto v. Am. Car Rental, Inc.,* 273 Conn.

478, 482 (2005).

   In *Votto*, the Connecticut Supreme Court concluded that the defendant car rental company

violated CUTPA by overcharging a consumer. *Votto,* 273 Conn. at 478. *Votto*, however, is not

analogous to Mr. Richards's case. In *Votto*, the defendant's pricing was "without question

unscrupulous, immoral, and oppressive." *Id.* The unscrupulousness of the defendant's conduct,

however, did stem not from its unreasonable prices. The defendant had also charged the plaintiff's

credit card for repairs that it had not done and had, according to the trial court, created a misleading

business card "to shield itself from irate customers." *Id.*

Mr. Richards has created a dispute of fact about whether Direct Energy's variable rates were "exorbitant" and whether the company is guilty of "gouging."  These facts, however, are not material to his CUTPA claim, because there is no case law suggesting liability under CUTPA for pricing decisions alone.  *See, e.g. Metropolitan Enterprise Corp. v. United Technologies Intern. Corp.*, 2005 WL 2300382, *7 (D. Conn. 2005) ("Simply favoring one bidder at the outset of the bidding process, without more, is not actionable under CUTPA."); *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 566 F. Supp. 2d 81, 105 (D. Conn. 2008), *aff'd*, 567 F.3d 79 (2d Cir. 2009) ("[T]he plaintiffs have not shown that the Port Authority's imposition of an excessive passenger fee is an unfair trade practice by the preponderance of the evidence.").  Mr. Richards has not presented additional evidence to suggest that Direct Energy's behavior was "unscrupulous," "unfair," or unanticipated in the unregulated energy market that the State of Connecticut created.  Accordingly, summary judgment is granted on this theory of liability under CUTPA.

### 3. Per Se Violation of CUTPA

Mr. Richards also argues that Direct Energy committed a *per se* violation of CUTPA by violating a Connecticut statute that requires electricity providers to give clear explanations of the rates they charge.  Mr. Richards argues that he is entitled to summary judgment on this claim, or, "at a minimum," that a material dispute remains as to whether Direct Energy violated the statute.  Pl.'s Opp. Mem., 18.  Direct Energy responds that its standard contracts "were submitted to and approved PURA" in 2012, and asks the Court to grant summary judgment in its favor.  Def.'s Reply, 11.  The Court agrees with Direct Energy.

A *per se* violation of CUTPA may be established by violations of certain provisions of the Connecticut General Statutes.  *See, e.g., Woronecki v. Trappe*, 228 Conn. 574, 579 (1994) (failure to comply with Home Improvement Act is *per se* violation of CUTPA by virtue of a statutory provision stating that explicitly).  "[T]ypically, a [violation by a] vendor of services or products who does not have the required license, or a vendor's contract for goods or services that does not contain

statutorily-required provisions," can amount to a *per se* CUTPA violation.  *68 Birch Lane Assocs.,*

*LLC v. Boutry*, No. FSTCV135014060S, 2013 WL 6916614, at *3 (Conn. Super. Ct. Dec. 2, 2013).

    Mr. Richards claims that the Evergreen Clause violated a state statute requiring energy

suppliers to make clear disclosures to consumers.  Consequently, he claims, Direct Energy violated

CUTPA. Mr. Richards cites in relevant part to statutory language that: "[e]ach contract for electric

generation services shall contain all material terms of the agreement," including "a clear and

conspicuous statement explaining the rates that such consumer will be paying" and "the

circumstances under which the rates may change."  Conn. Gen. Stat. §16-245o(f)(2). Under this

statute, "any violation" of Conn. Gen. Stat. §16-245 is also "deemed an unfair or deceptive trade

practice" under CUTPA. *Id.* at §16-245o(j).  The statute further states that "[a]ny contract for electric

generation services that the authority finds to be the product of unfair or deceptive marketing

practices or in material violation of the provisions of this section shall be void and unenforceable."

*See* Conn. Gen. Stat. Ann. § 16-245o.

    Under agency regulations, a Connecticut electric supplier's license must be reviewed by

PURA every five years.  *See* Decision, Docket No. 06-03-06RE02, App. of Direct Energy Servs.,

LLC for Electric Supplier License-Five Year Renewal (April 4, 2012), 3 (citing Conn. Agency Regs.

§16-16-245-1) ("Decision").[4]  PURA's periodic review includes a review of the supplier's service

contract and customer service plan.  *Id.*

    When it granted Direct Energy's application for a renewal of its license on April 4, 2012,

PURA noted that it had "reviewed [Direct Energy's] Standard Service Contract and Customer

Service Plan that contains the Company's termination policies and customer service procedures, and

finds them acceptable."  Decision, 3.  PURA also reopened its inquiry into Direct Energy's license in

2014, as part of an investigation into whether "every electric supplier doing business in Connecticut

---

[4] Available at http://www.dpuc.state.ct.us/dockhist.nsf/8e6fc37a54110e3e852576190052b64d/
902f1ef2b37f90be852579d70063c6bd?OpenDocument (last visited March 28, 2017).

has complied with §16-245o(g)(1)," which requires electric suppliers to provide written notice to consumers prior to the expiration of a fixed price term for a residential customer. *See* Decision to Reopen, Docket No. 06-03-06RE02, App. of Direct Energy Servs, LLC for Electric Supplier License- Five Year Renewal – Reopening.[5]  In a 2015 decision, PURA concluded that Direct Energy had violated §16-245o(g)(1) by failing to provide advance notice to some of its customers that their fixed price term had expired and by sending notices that did not inform the customer of a change in the generation price. *See* Decision, Docket No. 06-03-06RE03, App. Of Direct Energy Servs., LLC for Electric Supplier License- Five Year Renewal – Reopening.  PURA concluded that Direct Energy had properly refunded customers after these violations. *Id.*

"When the legislature has intended to make the violation of a consumer statute an automatic violation of CUTPA, it has done so expressly." *Jacobs v. Healey Ford–Subaru, Inc*., 231 Conn. 707, 727 (1995).  Still, while "CUTPA may authorize a cause of action that builds upon the public policy embodied in specific statutory provisions, such a CUTPA claim must be consistent with the regulatory principles established by the underlying statutes." *Mead v. Burns*, 199 Conn. 651, 665 (1986).

In *Mead*, the court held that the defendant insurance company was not entirely exempt from CUTPA on account of the fact that it was also regulated by the insurance commissioner under a different act. *Mead*, 199 Conn. at 663-64 (referencing "CUIPA").  Nevertheless, the court rejected the argument of the plaintiff and the Attorney General, who posited that "conduct not specifically prohibited by CUIPA may nonetheless offend the public policy of that statute and therefore may be actionable under CUTPA." *Id.* at 664.

The *Mead* court concluded that CUTPA should be interpreted to supplement pre-existing regulatory schemes.  It would be "anomalous," however, "to permit a CUTPA claim to override a

---

[5] Available at http://www.dpuc.state.ct.us/dockhist.nsf/8e6fc37a54110e3e852576190052b64d/89e71e8d07fe2f7e85257d79005eb547?OpenDocument (last visited March 28, 2017).

CUIPA regulatory pattern." *Mead*, 199 Conn. at 664.  While, as the *Mead* court acknowledged, other courts have interpreted CUTPA more broadly as it relates to CUIPA, *Mead*'s general message is instructive: A *per se* CUTPA claim should be assessed alongside the "regulatory pattern" of the statute on which it is based. *Id.* (citing *Doyle v. St. Paul Fire & Marine Ins. Co.*, 583 F. Supp. 554, 557 (D. Conn. 1984), which held that "it was implicit in the authorization of a private cause of action that an individual claimant should be permitted to seek redress without proof of a general course of conduct.").

Mr. Richards's *per se* CUTPA claim contradicts the "regulatory pattern" of the statute on which it is based.  By approving the language of Direct Energy's contract—and the Evergreen Clause—and by conducting period reviews of the company's compliance with Sec. 16-245, PURA suggested that Direct Energy's language did not violate the statute.  If the Court concluded that Direct Energy had violated CUTPA by violating Sec. 16-245, it would upend the regulatory scheme that the legislature created and that PURA enforces.   Direct Energy is entitled to summary judgment on Mr. Richards's *per se* CUTPA claim.

### C. Breach of Contract Claim

Finally, Mr. Richards argues that Direct Energy violated the covenant of good faith and fair dealing that is implied in its customer service contract.  Direct Energy claims that summary judgment is appropriate on this claim because Mr. Richards had "no expectation about how his variable rate would be set."  Def.'s Mem., 23.  In the alternative, it argues that Mr. Richards's expectation was unreasonable.  *Id.* at 29.  Direct Energy also argues that no reasonable fact-finder would find that Direct Energy acted with bad faith.  *Id.*  The Court need not address Direct Energy's arguments about Mr. Richards's expectations because it agrees with its argument about bad faith.  Mr. Richards has not put forth sufficient evidence to create a material factual dispute about Direct Energy's bad faith, which is required for his breach of contract claim.

The duty of good faith and fair dealing, which is implied into almost every contractual relationship, requires that "neither party do anything to injure the other's right to receive the benefits of the contract." *Landry v. Spitz*, 102 Conn. App. 334, 344 (2007). To establish that the covenant of good faith and fair dealing has been breached, "a plaintiff must show that the acts by which a defendant allegedly impeded the plaintiff's right to receive reasonably expected contract benefits were taken in bad faith." *Id.* A claim under the duty of good faith and fair dealing "must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty." *Id.* ("Most courts decline to find a breach of the covenant apart from a breach of an express contract term."). "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2005) (internal quotation marks omitted).

Direct Energy argues that Mr. Richards "has no evidence that Direct Energy set its rates in bad faith," making summary judgment appropriate on his breach of contract claim. The Court agrees.

To constitute a breach of the implied covenant, "the acts by which a defendant allegedly impede[d] the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *De La Concha*, 269 Conn. at 433. Bad faith implies "actual or constructive fraud," a "design to mislead or deceive another," or "a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Habetz v. Condon,* 224 Conn. 231, 237-38 (1992). "Bad faith means more than mere negligence; it involves a dishonest purpose." *Id.* The Restatement (Second) of Contracts, which Mr. Richards cites in his opposition brief, provides the following examples of bad faith: "evasion of the spirit of the bargain, lack of diligence and slacking

off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."  Restatement (Second) of Contracts § 205.

Despite the duties incorporated into the implied covenant, courts are clear that it does not "undermine a party's 'general right to act on its own interests in a way that may incidentally lessen'" the other party's expected benefit.  *M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (per curiam) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.,* 30 N.Y.2d 34, 46, *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)).  For this reason, the covenant "will be breached only in a narrow range of cases."  *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014).

In cases where a violation of the covenant is alleged in relation to a defendant's setting of prices, courts have required more than high prices or profit margins to find a breach.  Mr. Richards's case citations make this point clear.  *See* Pl.'s Opp. Mem., 34 (citing *Hassler v. Sovereign Bank*, 374 Fed. Appx. 341, 345 (3rd Cir. 2010), *Votto*, 273 Conn. 478, 485 (2005), and *Anthony's Pier Four, Inc. v. HBC Assoc's.*, 411 Mass. 451, 473 (1991)).

In *Hassler*, a bank posted a check and a debit made from customer's checking account in reverse chronological order, resulting in two overdraft fees rather than one.  *Hassler v. Sovereign Bank*, 374 F. App'x 341 (3d Cir. 2010).  The Third Circuit approved of the trial court's dismissal of the plaintiff's bad faith and fair dealing claim because the plaintiff had made no allegations of "bad intent" other than the defendant's "simply seeking profit."  *Id.* at 345.  As the court summarized it, "the allegations of the Complaint, boiled down, amount to: [the bank] re-ordered the charges [to the customer], this resulted in overdraft fees, and this was unfair."  *Id.* at 344; *see also Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 773 A.2d 1121, 1130 (2001) (quotation omitted) ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.").

Mr. Richards also cites *Anthony's Pier Four, Inc. v. HBC Associates*, in which the Massachusetts Supreme Court concluded that a contracting party, Anthony's Pier Four, Inc., had breached the implied covenant by overcharging its business partner in a development deal. *Anthony's Pier Four, Inc. v. HBC Assoc's*, 411 Mass. 451, 473 (1991). In this case, Anthony's denied approval for HBC's basic development plan, citing a contract clause in the development deal that gave it the discretion to approve HBC's business plans, which prompted HBC to sue. *Id.* The trial court found that Anthony's had previously approved of the plans, but abruptly denied approval for its own commercial advantage. *Id.* It further concluded that "Anthony's withheld its approval in an attempt to force HBC to sweeten the deal" after it had already started construction, using its "discretionary right under the agreements as a pretext" to take advantage of the other party. *Id.*

At oral argument, when asked for a case where a Connecticut court had concluded that a company's pricing decision, without more, would provide evidence of its bad faith, Mr. Richards's counsel once again relied on *Votto*, a CUTPA case that, as the Court noted above, bears little resemblance to the dispute at issue here.

As a result, Mr. Richards has not produced a case suggesting that the use of a discretionary term to pursue a higher profit, without more, amounts to bad faith. Here, Direct Energy did not use its discretion to set prices as a "pretext" to conceal ulterior motives not contained in the contract. *Anthony's*, 411 Mass. at 473. Nor did Direct Energy make charges that were explicitly unauthorized, or deceive customers with false business cards or offers of assistance. *Votto*, 273 Conn. at 481. Rather, Mr. Richards claims that Direct Energy violated the covenant by "simply seeking profit." *Hassler*, 374 F. App'x at 344. However disconcerting Direct Energy's rates are, they are not, alone, a sufficient basis for a fact finder to surmise that the company acted in bad faith.

In addition to Mr. Richards's own briefing, cases under Section 2-305 of the UCC provide further support for the contention that a plaintiff must show more than high prices to create a factual dispute about a defendant's bad faith. Section 2-305, like the Evergreen Clause, requires parties to

charge a "reasonable price … in good faith" if a contract leaves a price term open or unsettled.  *See* U.C.C. § 2-305 (Conn. Gen. Stat. § 42a-2-305); *see also Marcus Dairy, Inc. v. Rollin Dairy Corp*., No. CIV.3:05CV589(PCD), 2008 WL 4425954, at *9 (D. Conn. Sept. 24, 2008) (analyzing § 2-305 claim and implied covenant of good faith and fair dealing claims as one, because both stemmed from plaintiff's setting of prices).  Although courts have adopted varying approaches in analyzing prices under Section 2-305, it is clear that, "under any of these approaches, [the plaintiff] must produce some evidence of improper motive, discriminatory pricing, or the pricing practices of other franchisees."  *Yonaty v. Amerada Hess Corp.,* No. 3:04–CV–605, 2005 WL 1460411, 2005 U.S. Dist. LEXIS 22429, *5 (N.D.N.Y. June 20, 2005) (describing cases concerning open price terms in gas franchise contracts).

     To find liability under Section 2-305, courts require evidence of a party's improper motive— discriminatory pricing to run buyer-franchisees out of business, for example—or evidence that its price is unreasonable compared to those of competitors.  *Compare Wayman v. Amoco Oil Co.,* 923 F.Supp. 1322, 1349 (D.Kan.1996), *aff'd,* 145 F.3d 1347 (10th Cir.1998) ("[T]his court believes the present case is a normal case. If there was evidence that Amoco had, for example, engaged in discriminatory pricing or tried to run plaintiffs out of business, then the court's decision might be different."), *with Nanakuli Paving & Rock Co. v. Shell Oil Co.,* 664 F.2d 772, 806 (9th Cir.1981) (stating that "the dispute here was not over the amount of the increase—that is, the price that the seller fixed—but over the manner in which that increase was put into effect"), *and Allapattah v. Exxon Corp.,* 61 F.Supp.2d 1308, 1322 (S.D.Fla.1999) ("Because the parties' dispute is not over the actual amount of the purchase price Exxon charged for its wholesale gasoline to its dealers, but rather over the manner in which the wholesale price was calculated without considering the double charge for credit card processing, the instant action is not the 'normal' case.").

     When a party can find no evidence of bad faith, discriminatory price-fixing, or double-charging, the party may suggest that the disputed price was outside of the "range of prices in the

market" to survive summary judgment. *Marcus Dairy*, 2008 WL 4425954, at *10. In *Marcus Dairy*, the court denied summary judgment on the defendant's claims about unfair prices, which arose under Section 2-305 and the implied covenant of good faith and fair dealing, because disputed issues remained about whether the price charged was within the "range of prices in the market." *Id.* The court noted that the fact that the defendant had "paid the highest prices of the four competitors [did] not by itself prove that the price was 'commercially unreasonable.'" *Id.*

While the court is not bound by decisions interpreting the UCC, especially those from other districts or circuits, these decisions provide further support for the notion that high prices alone cannot support a claim for the breach of the implied covenant. Mr. Richards would, at the very least, need to show that Direct Energy's prices were outside of the range of prices charged by its competitors, or that the company set them with some improper motive, other than making a profit, in order to survive summary judgment. Since there is no evidence in this record to support either proposition, Mr. Richard's breach of the implied covenant claim is dismissed.

## IV.    Mr. Richards's Motion for Class Certification

On May 27, 2015, Mr. Richards moved to certify a class under Rule 23(b)(3). *See* Motion, ECF No. 105. Mr. Richards also moved to be appointed as Representative of the Class and that his counsel, Izard Nobel, LLP, be appointed as Class Counsel pursuant to Rule 23(g)(1). Direct Energy opposed class certification.

The Court need not address Mr. Richards's motion. The Federal Rules of Civil Procedure provide that a district court must rule on the issue of class certification "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1). This provision affords district courts with flexibility when presented with both a dispositive motion and a motion for class certification. *See Project Release v. Prevost*, 722 F.2d 960, 964 (2d Cir.1983) (noting that "class certification was sought by appellants in the district court but was not ruled upon."). A district court may reserve decision on a class certification motion until the disposition of a motion for

summary judgment.  *See Encarnacion v. Astrue*, 491 F.Supp.2d 453, 459 (S.D.N.Y.2007), *aff'd*, 568 F.3d 72 (2d Cir.2009).  Indeed, this chronology may be "appropriate depending on the complexity of the legal or factual issues raised by the motion to certify" and the prejudice that either party might face. *Christensen v. Kiewit-Murdock Inv. Corp.*, 815 F.2d 206, 214 (2d Cir. 1987); *Wright v. Schock*, 742 F.2d 541, 544 (9 Cir.1984) (district court had discretion to decide summary judgment motion before class certification motion so as "to protect both the parties and the court from needless and costly further litigation.").

Having determined that Defendant is entitled to summary judgment on all of Mr. Richards's claims, the Court need not determine his class certification motion and it therefore is moot.

**V.   Conclusion**

Defendants' Motion for Summary Judgment is GRANTED.  Accordingly, Mr. Richards's motion for class certification is denied as moot.

SO ORDERED at Bridgeport, Connecticut this 31st day of March 2017.

/s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE