**MANDATE**

3:14cv1724 VAB

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of February, two thousand and nineteen.

Before:     Rosemary S. Pooler,
            Barrington D. Parker,
            Debra Ann Livingston,
                    *Circuit Judges.*

_____

Gary W. Richards, on behalf of himself and all
others similarly situated,                          **JUDGMENT**
                                                    Docket No. 17-1003
            Plaintiff - Appellant,

v.

Direct Energy Services, LLC,

            Defendant - Appellee.

_____

The appeal in the above captioned case from a judgment of the United States District Court for the District of Connecticut was argued on the district court's record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 02/25/2019**

17-1003-cv
*Richards v. Direct Energy Servs., LLC*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2017

(Argued: April 11, 2018      Decided: February 4, 2019)

No. 17-1003-cv

———————————————————

GARY W. RICHARDS,
on behalf of himself and all others similarly situated,

*Plaintiff-Appellant,*

-v.-

DIRECT ENERGY SERVICES, LLC,

*Defendant-Appellee.*

———————————————————

Before:      POOLER, PARKER, and LIVINGSTON, *Circuit Judges*.

Plaintiff-Appellant Gary Richards ("Richards") entered into a consumer electricity contract with Defendant-Appellee Direct Energy Services, LLC ("Direct Energy").   Richards stayed on this contract for fifteen months.   The contract initially guaranteed Richards a fixed electricity rate that was 10% lower than the state-approved electricity rate.   Consistent with the terms of the contract, Richards's fixed-rate plan was converted into a variable rate plan after the first twelve months.   Direct Energy then continued supplying electricity to Richards at a new variable rate for three months, at two cents more per kilowatt hour

1

("kWh") than the state-approved rate. The contract stated that this variable rate would be calculated to reflect "business and market conditions." After terminating his contract, Richards sued Direct Energy, alleging breach of contract, deceptive and unfair trade practices, and unjust enrichment. The United States District Court for the District of Connecticut (Bolden, *J.*) dismissed several of Richards's claims, and granted summary judgment to Direct Energy on his remaining claims. The judgment of the district court is AFFIRMED.

JUDGE POOLER concurs in part and dissents in part in a separate opinion.

| | |
|---|---|
| FOR PLAINTIFF-APPELLANT: | ROBERT A. IZARD (Craig A. Raabe, *on the brief*), Izard, Kindall & Raabe LLP, West Hartford, CT, *for Gary W. Richards*. |
| FOR DEFENDANT-APPELLANT: | MICHAEL D. MATTHEWS (James M. Chambers, Hutson B. Smelley, Robert P. Debelak III, *on the brief*), McDowell & Hetherington LLP, Houston, TX, *for Direct Energy Services, LLC*. |

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Plaintiff-Appellant Gary W. Richards ("Richards") entered into an electricity contract with Defendant-Appellee Direct Energy Services, LLC ("Direct Energy"). The contract provided that, for the first twelve months, Direct Energy would guarantee Richards a fixed electricity rate that was 10% below the state-approved rate. But if Richards did not leave the contract at the end of that year, Direct Energy would begin charging him a new variable rate. The variable rate, according to the contract, would be set on a month to month basis according to

2

Direct Energy's "discretion" and would reflect "business and market conditions."

J.A. 157.   Richards was free to terminate the contract at any time without paying

a penalty.   After twelve months on the discounted fixed rate plan, Richards began

paying the variable rate.   During this time, the variable rate was two cents more

per kilowatt hour ("kWh") than the state-approved rate.   Richards switched

electricity providers after fifteen months with Direct Energy (twelve on the

discounted fixed rate, three on the variable rate), complaining that the variable

rate was set too high.   He then sued Direct Energy for breach of contract,

deceptive and unfair trade practices, and unjust enrichment, and also sought to

represent a class of all Direct Energy customers who paid the variable rate in

Connecticut and Massachusetts.   The district court dismissed several of his

claims and granted summary judgment to Direct Energy as to the rest.

This is the latest in a line of class actions challenging consumer gas and

electricity rates in the wake of market deregulation.[1]   Richards's principal claim

is that Direct Energy breached its contract with Richards and violated state unfair

and deceptive trade practices law by not pegging its variable rate to Direct

---

[1]  *See, e.g.*, *Hamlen v. Gateway Energy Servs. Corp.*, No. 16 Civ 3526, 2017 WL 6398729, at *8 (S.D.N.Y. Dec. 8, 2017); *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 142 (D. Conn. 2015); *Yang Chen v. Hiko Energy, LLC*, No. 14 CV 1771, 2014 WL 7389011, at *4 (S.D.N.Y. Dec. 29, 2014).

Energy's procurement costs. We disagree. By the contract's plain terms, Direct Energy promised that the variable rate would be set in its discretion and that it would reflect "business and market conditions," a phrase which encompasses more than just procurement costs. Accordingly, the judgment below is AFFIRMED.

## BACKGROUND

### I. Factual Background[2]

### A

This is a contract dispute set in the context of Connecticut's electricity market. ISO New England, Inc. is responsible for administering a market in which local electricity distribution companies bid on electricity supplied by power generators. In Connecticut, two electric distribution companies, Eversource and United Illuminating, maintain monopoly control over electricity distribution systems within set geographic zones and are ultimately responsible for distributing electricity to consumers in those zones. Consumers may enter into

---

[2] The facts outlined below primarily relate to the claims dismissed on summary judgment and are therefore either undisputed or presented in the light most favorable to Richards. *See Raspardo v. Carlone*, 770 F.3d 97, 111 (2d Cir. 2014). As for Richards's claims dismissed on the pleadings, we accept all factual allegations as true and draw all reasonable inferences in Richards's favor. *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

electricity contracts with either company directly. All these contracts offer electricity at "Standard Service Rates," which Connecticut's Public Utilities Regulatory Authority ("PURA") approves in advance. *See* Conn. Gen. Stat. § 16-19(a).

In 2000, Connecticut deregulated its consumer electricity market. Consumers may still purchase electricity from either Eversource or United Illuminating at their PURA-approved Standard Service Rates (effectively a public option), but they may instead choose to contract with one of the forty PURA-licensed retail electricity suppliers (the private market), all of which piggyback on Eversource and United Illuminating's electricity distribution systems. These suppliers purchase power that they then sell to consumers at market-based, unregulated rates. Many offer variable prices, promotional rates, guarantees that energy will come from renewables, and incentives like cash rebates and gift cards. Some suppliers also include "guaranteed savings" provisions in their contracts, which ensure that consumers will save money compared to the Standard Service Rates. In general, the Standard Service Rates tend to adjust more slowly in response to changes in the wholesale electricity market than market rates.

Although PURA does not regulate suppliers' rates, it regulates the suppliers themselves. PURA licenses all private electricity suppliers, *id*. § 16-245(a)–(b), and reviews these licenses every five years, Conn. Agency Regs. § 16-245-2(f). It also polices how suppliers word their consumer contracts. Among other things, these contracts must contain:

- "all material terms of the agreement";

- "a clear and conspicuous statement explaining the rates that [ea]ch customer will be paying, including the circumstances under which the rates may change";

- "a clear and conspicuous statement . . . describing any penalty for early termination of such contract"; and

- "a statement that provides specific directions to the customer as to how to compare the price term in the contract to the customer's existing . . . charge on the electric bill and how long those rates are guaranteed."

Conn. Gen. Stat. § 16-245o(f)(2). Finally, Connecticut's state government helps maintain an electricity-comparison website that lists available electricity suppliers and compares electricity suppliers' rates and other relevant contract terms to each other and to the default Standard Service Rates.[3]

---

[3] *See* "Compare Generation Rates," ENERGIZE CT, https://www.energizect.com/compare-energy-suppliers (last visited July 4, 2018).

**B**

Direct Energy is a private electricity supplier that offers several different electricity plans to consumers in the private market.  Some of its plans come with add-ons, like an Internet-connected Nest thermostat, a home warranty, or a guarantee that 100% of the energy will come from "green" sources.  During the time at issue in this case, all of Direct Energy's plans were "Evergreen plans," meaning that Direct Energy would charge a fixed rate for a set time (between twelve and thirty-six months), and at the end of that period, if the customer took no action, Direct Energy would charge a variable rate that could change each month.

Direct Energy balanced several factors when setting the variable rate.  In general, Direct Energy targeted a certain profit margin based on its own cost of energy while not setting the rate so high that customers would leave. Competitors' prices, market-share objectives, supply hedging strategies, legislative and regulatory requirements, and market risk helped inform these factors.  Direct Energy's variable rate was higher than its fixed rate, so when a customer switched to the variable rate, Direct Energy often reduced the customer's

variable rate for the first few months to smooth the transition.    At one point, more than half of Direct Energy's Connecticut customers were paying the variable rate.

In March 2012, Gary Richards signed a two-page electricity contract with Direct Energy guaranteeing him a fixed electricity rate of 7.45 cents per kWh for one year.    This was an Evergreen plan, so after the year expired, Richards's "service [would] automatically continue each month without additional notice, and [Richards] [would] pay a variable rate per kWh, which [could] be higher or lower each monthly billing cycle."    J.A. 157.    The contract further stated:

> After the Initial Term and during the Renewal Period, the rate for electricity will be variable each month at Direct Energy's discretion.    The rate may be higher or lower each month based upon business and market conditions.

*Id.*    We refer to this as "the Evergreen clause."    Richards could cancel the contract "at any time without an early cancellation fee."    *Id.*    These terms were all included on the first page of the contract, and PURA had earlier determined that this contract was sufficiently clear and fulfilled all the requirements mandated by Conn. Gen. Stat. § 16-245o(f)(2).

After using the Connecticut government's electricity-comparison website mentioned above, Richards chose Direct Energy because it promised "the best fixed rate that [he] could get at the time" and no termination fee.    J.A. 121.    He

did not consider any other factors, nor did he have any expectations about how the variable rate would work. But he still paid attention to his electricity rate during the fixed-rate period and compared rates on the Connecticut electricity website several times. At one point, he tried to switch electricity providers to get a better fixed rate, but the new provider never followed up on his inquiries.

Richards ultimately stayed on the Direct Energy contract through the full twelve months, did not opt out at the end, and so was rolled over onto the variable rate, which he paid for three months starting in April 2013. For those three months, the variable rate stayed constant at 10.64 cents per kwH, or 2.36 cents per kWh higher than Eversource's PURA-approved Standard Service Rate during this time.[4] There is no evidence in the record that Direct Energy's variable rate was higher than the rates charged by Direct Energy's market competitors. Direct Energy's procurement costs were also largely constant during this three-month period.

In August 2013, Richards noticed that his electricity bills had risen compared to previous months, so he canceled his contract with Direct Energy and switched electricity providers. Over the course of the fixed-rate period, Richards

---

[4] The record does not disclose United Illuminating's Standard Service Rate.

paid $114 less than he would have under Eversource's Standard Service Rate. But his three months on the variable rate eliminated those savings.   In total, for the fifteen months he signed with Direct Energy, Richards, a former Vice President for AT&T, paid $25 more than he would have under the Standard Service Rate — or about $1.67 per month extra.

Richards submitted a letter to PURA complaining about Direct Energy in March 2014.   Shortly after, Robert Izard, an attorney who has filed lawsuits like this one against other electricity suppliers, *see, e.g., Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132 (D. Conn. 2015), contacted Richards and encouraged him to sue.   Richards then retained Izard to represent him in this case.

## II. Procedural History

In November 2014, Richards sued Direct Energy in the United States District Court for the District of Connecticut (Bolden, *J.*) alleging breach of contract, unjust enrichment, and unfair and deceptive trade practices under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a), and the Massachusetts Regulation of Business Practices for Consumers' Protection Act, Mass. Gen. Laws ch. 93A, § 1.   He sought to certify a class of similarly situated Direct Energy customers who lived in Connecticut and Massachusetts.

Most of his allegations concerned Direct Energy's variable rate beginning in the winter of 2013–2014 — well after Richards left Direct Energy.   Starting in that (unusually cold) winter, the variable rate jumped by about 50% and stayed level through August 2015.   Generally, the variable rate was about 75% higher than Direct Energy's procurement costs, which fluctuated significantly, but the variable rate was *lower* than its procurement costs during the 2013–2014 winter.   Direct Energy thus kept variable rates steady through 2014 (and into 2015) to recover from its winter losses.   Many other electricity companies never recovered from their winter losses and went out of business.

The district court dismissed Richards's Massachusetts state law and Connecticut unjust enrichment claims on August 4, 2015.   *See Richards v. Direct Energy Servs., LLC*, 120 F. Supp. 3d 148 (D. Conn. 2015).   Because Richards is a Connecticut resident who was injured in Connecticut and not Massachusetts, the court concluded that Richards lacked Article III standing to bring an unfair and deceptive trade practices claim under Massachusetts law.   Richards also failed to state a claim for unjust enrichment because "[a] plaintiff . . . cannot plead a claim of unjust enrichment if he also pleads the existence of an express contract," as Richards had.   *Id.* at 165.

11

During discovery, the parties produced dueling expert witness reports. As relevant here, Richards's experts, economists who had been retained to produce expert witness reports in prior class actions like this one, opined that Direct Energy's variable rate should be "consistent with" Direct Energy's procurement costs, "plus an appropriate margin to cover the legitimate costs and risks of supplying Variable Rate customers." Confidential App. 44. At the same time, the experts made clear that they did not "offer an opinion on" how the Evergreen clause should be interpreted. *Id.* at 374; *see also id.* at 164 ("I'm not the expert on, you know, legal meaning of business and market conditions. But as an economist, you know, I do have an opinion professionally . . . ."). Their conclusions were purportedly based on, as one put it, "[their] personal economic belief of what is reasonable," given their knowledge of the electricity market. *Id.* at 374.

The district court granted summary judgment to Direct Energy on Richards's remaining claims on March 31, 2017. *See Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538 (D. Conn. 2017). Direct Energy was entitled to summary judgment on Richards's contract claim, the district court concluded, because Richards had not "put forth sufficient evidence to create a material factual

dispute about Direct Energy's bad faith," as required for his claim based on an alleged breach of the covenant of good faith and fair dealing.   *Id.* at 557.

The district court also granted summary judgment to Direct Energy on Richards's unfair and deceptive trade practices claims under Connecticut law. Richards had argued that the Evergreen clause was deceptive because a reasonable consumer would interpret it to mean that Direct Energy would charge consumers its procurement costs, plus a fixed profit margin.   The district court disagreed and held that the clause plainly gave Direct Energy "discretion to set a profit margin of its choosing when determining variable rates."   *Id.* at 552.   Next, Richards contended that his contract with Direct Energy failed adequately to explain "the circumstances under which the rates [could] change," which if true, would be a *per se* unfair trade practice.   *Id.* at 555 (quoting Conn. Gen. Stat. § 16–245o(f)(2)), *see also* Conn. Gen. Stat. § 16–245o(j).   The district court rejected this argument because PURA had approved the contract language at issue.   Finally, Richards argued that Direct Energy set the variable rate so high as to be "unfair" under Connecticut law.   Not so, the district court held, because "pricing decisions alone" do not constitute unfair trade practices.   *Id.* at 554.

Finally, the district court dismissed Richards's motion for class certification as moot because it had dismissed or granted summary judgment on all of Richards's claims.   Final judgment was entered on March 31, 2017.

## DISCUSSION

On appeal, Richards challenges the district court's March 31, 2017 grant of summary judgment to Direct Energy on his contract and Connecticut unfair and deceptive trade practices claims, and its August 4, 2015 dismissal of his unjust enrichment and Massachusetts unfair trade practices claims.   For the reasons that follow, we AFFIRM the judgment of the district court.

## I

"We review a grant of summary judgment de novo, examining the evidence in the light most favorable to, and drawing all inferences in favor of, the non-movant."   *Blackman v. New York City Transit Auth.*, 491 F.3d 95, 98 (2d Cir. 2007) (per curiam) (quoting *Sheppard v. Beerman*, 317 F.3d 351, 354 (2d Cir. 2003)). "Summary judgment is appropriate only if it can be established 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"   *Sheppard*, 317 F.3d at 354–55 (quoting Fed. R. Civ. P. 56(a)).

**A**

Richards argues that Direct Energy breached its contract with him because it violated the implied covenant of good faith and fair dealing. Under Connecticut law, the implied covenant attaches to every contract and "requir[es] that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Renaissance Mgmt. Co. v. Connecticut Hous. Fin. Auth.*, 915 A.2d 290, 297–98 (Conn. 2007) (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004)). The covenant is thus "not implicated by conduct that does not impair contractual rights." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 67 A.3d 961, 987 (Conn. 2013).

To establish a breach of the implied covenant, the plaintiff must also show that the defendants' allegedly wrongful acts were "taken in bad faith." *De La Concha*, 849 A.2d at 388 (quoting *Alexandru v. Strong*, 837 A.2d 875, 883 (Conn. App. Ct. 2004)). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Id.* (quoting *Habetz v. Condon*, 618 A.2d 501, 504 (Conn. 1992)). Because this is a high bar, "[t]he

15

covenant will be breached only in a narrow range of cases." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014); *see also* Restatement (Second) of Contracts § 205 cmt. e (Am. Law Inst. 1981) (listing, as paradigmatic examples of such breaches, "harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract").

Richards's contention that Direct Energy breached the implied covenant of good faith and fair dealing ultimately rests on his interpretation of the Evergreen clause. Again, the clause states:

> After the Initial Term and during the Renewal Period, the rate for electricity will be variable each month at Direct Energy's discretion. The rate may be higher or lower each month based upon business and market conditions.

J.A. 157. In Richards's view, "a reasonable consumer would understand [this] contract language to mean that [the] variable rate[] would fluctuate with [Direct Energy's] procurement costs." Pl.-Appellant Br. 54. And because the variable rate stayed constant while procurement costs fluctuated from the winter of 2013–2014 through August 2015, Direct Energy "ignored the language of the contract." *Id.* at 55. Richards contends that, at minimum, his two experts attested that a reasonable consumer would interpret the Evergreen clause this way, which raises

a plausible question of fact as to the clause's appropriate interpretation. He also maintains that Direct Energy acted in bad faith because Direct Energy set its variable rates too high, and "lure[d] new customers into enrolling . . . by offering low fixed teaser rates for a set period of time." *Id.* at 20. For the following reasons, we disagree.

Direct Energy did not "evade[] [the contract's] spirit" or frustrate Richards's "justified expectations." *Landry v. Spitz*, 925 A.2d 334, 345 (Conn. App. Ct. 2007). The Evergreen clause states that Direct Energy had "discretion" to set the variable rate "based upon business and market conditions." J.A. 157. The record reflects that Direct Energy set the variable rate to achieve a target profit margin, match competitors' prices, and reduce customer losses, among other objectives. As a matter of plain meaning, these sorts of considerations constitute "business and market conditions." *See, e.g.*, *Black's Law Dictionary* (10th ed. 2014) (defining "business" as "[a] commercial enterprise carried on *for profit*" and "market" as "the extent of *economic demand*" (emphasis added)); *see also* U.C.C. § 2-723(1) (Am. Law Inst. & Unif. Law Comm'n 2017) (explaining that, in calculating damages in the contracts context, "*market* price . . . shall be determined according to the [prevailing] price of such goods" (emphasis added)). The Evergreen clause in no

17

way states or implies that such considerations are improper, nor does it suggest

that the variable rate bears a direct relationship to Direct Energy's procurement

costs.

Richards's experts' testimony adds nothing to his breach of contract claim.

These experts opined only on what factors the variable rate *should* reflect, in their

view, while declining to "offer an opinion on" how the Evergreen clause should

be *interpreted*.   Confidential App. 374; *see also id.* at 164 ("I'm not the expert on,

you know, legal meaning of business and market conditions.   But as an

economist, you know, I do have an opinion professionally . . . .").   And the

experts' interpretation of the Evergreen clause would be irrelevant *even if they had*

*opined on its legal meaning* because "the construction of unambiguous contract

terms is strictly a judicial function."   31A *Am. Jur. 2d Expert and Opinion Evidence*

§ 294 (2018) (explaining that, "unless the words or phrases [in a contract] . . . are

terms of art," expert testimony "regarding the meanings of contractual provisions

[is] irrelevant and hence inadmissible").[5]   Courts across the country have thus rightly dismissed arguments like Richards's even at the pleadings phase.[6]

To be sure, even though the Evergreen clause gave Direct Energy discretion in setting the variable rate, Direct Energy was obliged to "exercise that discretion

---

[5]  For the same reason, the dissent's observation that ambiguous contract language creates a jury question regarding the parties' intent, *Dissenting Op.* at 12, misses the point. In the context of Richards's claim, the Evergreen clause is *not* ambiguous.   Richards himself testified that even he did not interpret the contract as he would now have us read it.   *See* J.A. 135 (agreeing that Direct Energy had "[p]retty much" complete discretion in deciding how to set its variable rate).   While there might be some pricing considerations that would fall outside the "business and market conditions" that Direct Energy was explicitly authorized to consider, nothing in that phrase suggests the specific limitation that Richards now argues for.   The dissent's contention that a "reasonable juror . . . could find that Direct Energy tied its price-setting discretion to its cost of doing business," *Dissenting Op.* at 12–13, is patently incorrect, so long as jurors are constrained by law, and not permitted to invent absent contract terms out of thin air.

[6]  *See Orange v. Starion Energy PA, Inc*, No. CV 15-773, 2016 WL 1043618, at *4 (E.D. Pa. Mar. 16, 2016), *aff'd*, 711 F. App'x 681 (3d Cir. 2017); *Windley v. Starion Energy, Inc.*, No. 14-CV-9053, 2016 WL 197503, at *2 (S.D.N.Y. Jan. 8, 2016), *appeal withdrawn*, No. 16-320 (2d Cir. 2016); *Zahn v. N. Am. Power & Gas, LLC*, No. 14 C 8370, 2015 WL 2455125, at *4 (N.D. Ill. May 22, 2015), *rev'd and vacated in part on other grounds*, 847 F.3d 875 (7th Cir. 2017); *Urbino v. Ambit Energy Holdings, LLC*, No. Civ. 14-5184, 2015 WL 4510201, at *4–5 (D.N.J. July 24, 2015); *Faistl v. Energy Plus Holdings, LLC*, No. Civ. 12-2879, 2012 WL 3835815, at *5–6 (D.N.J. Sept. 4, 2012).

Moreover, because there is no evidence in the record that Direct Energy supplemented the terms of its written contract with additional representations to Richards, this case is different from those where defendants are alleged to have misrepresented to the plaintiffs that the "business and market conditions" clauses would guarantee below-market prices.   *See Todd v. XOOM Energy Maryland, LLC*, No. GJH-15-0154, 2017 WL 667198, at *8 (D. Md. Feb. 16, 2017); *Melville v. Spark Energy, Inc.*, No. 15-8706, 2016 WL 6775635, at *4 (D.N.J. Nov. 15, 2016); *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 418–19 (E.D. Pa. 2016); *Mirkin v. Viridian Energy, Inc.*, No. 3:15-CV-1057, 2016 WL 3661106, at *6–7 (D. Conn. July 5, 2016).

in good faith." 23 *Williston on Contracts* § 63:22 (4th ed. 2018). Richards has

come forth with no evidence to suggest that it did not. Although Richards

charges, for instance, that Direct Energy's variable rate was "too high," there is no

evidence that it was any higher than its competitors' rates. *See Marcus Dairy, Inc.*

*v. Rollin Dairy Corp.*, No. 05-cv-589, 2008 WL 4425954, at *9 (D. Conn. Sept. 24, 2008)

("To determine if a price is commercially reasonable[] it must be compared to the

range of other prices in the market."). The factors influencing the variable rate

(minimizing customer losses, reaching a target profit margin) are ordinary

business considerations. *See id.* at *7 (stating that merchants act in good faith

when setting open price terms if they adhere to "reasonable commercial standards

of fair dealing in the trade" (quoting U.C.C. § 2–305 cmt. 3 (Am. Law Inst. & Unif.

Law Comm'n 2017))). And Richards in fact seems to concede that all Connecticut

private electricity suppliers "engag[e] in similar . . . pricing behavior," which he

insistently labels "improper" while offering no coherent explanation (much less

evidence) as to why this is so. Reply Br. 17 n.12.

Richards counters that Direct Energy must have abused its discretion

because the variable rate was higher than the PURA-approved Standard Service

Rate. In his view, the Standard Service Rates, rather than Direct Energy's private

competitors' rates, are the proper comparators because Connecticut's private electricity suppliers are all "corrupt."   Reply 17 n.12.   But it is worth pausing to consider the implications of Richards's argument.   If we were to hold private electricity suppliers liable for departing from the Standard Service Rates, we would in effect make those PURA-approved rates binding on private electricity suppliers like Direct Energy.   Yet the entire point of electricity deregulation was to allow the market, rather than PURA, to determine rates.[7]   Richards's near-frivolous contract claim provides no basis on which a court is authorized to overrule this policy choice.

Richards's accusation that Direct Energy violated the implied covenant of good faith by "luring new customers . . . by offering low fixed teaser rates," Pl.-Appellant Br. 20, is equally unavailing.   Richards may find this practice objectionable, but he received exactly what he bargained for: after paying a fixed rate below the PURA-approved Standard Service Rates for a fixed time, Richards would pay a variable rate set at Direct Energy's discretion.   *See* 23 *Williston on Contracts* § 63:22 (4th ed. 2018) ("[T]here can be no breach of the implied promise

---

[7]   Indeed, if Richards wanted to pay less than he would have paid under the Standard Service Rate, he could have chosen a contract with a "guaranteed savings" clause that promised just that.

or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract.").   Richards voluntarily chose this contract after considering more than forty competitor options because he thought it was the best available.   He cannot allege breach of contract where, as here, Direct Energy delivered to him precisely what he purchased.

Richards's contract claim is thus without merit.   But even if this were not the case, Richards still could not prevail.   His argument is largely predicated on the theory that Direct Energy unjustifiably unmoored its variable rate from Direct Energy's procurement costs.   But Richards focuses exclusively on Direct Energy's pricing practices in 2014 and 2015, yet Richards left Direct Energy in 2013.   For the three months that Richards paid it, the variable rate and Direct Energy's costs stayed constant, and the variable rate was only 2.36 cents per kWh higher than Eversource's PURA-approved Standard Service Rate.   *Cf.* 14 David M. Stahl & Lisa M. Cipriano, *Bus. & Com. Litig. Fed. Cts.* § 143:35 (4th ed. 2017) ("[A] filed and approved rate is unassailable in judicial proceedings brought by customers.").   Richards would thus not be a proper plaintiff even if his legal theory had any

merit, which it does not. We therefore affirm the district court's grant of summary judgment to Direct Energy on Richards's contract claim.

**B**

The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Under CUTPA, "unfair methods of competition," "unfair . . . acts," and "deceptive acts" are distinct categories of wrongful conduct. *See* 12 Robert M. Langer, *et al.*, *Conn. Prac., Unfair Trade Practices* § 2.3 (2017). Richards argues that Direct Energy's variable rate pricing was (1) deceptive, (2) a *per se* violation of CUTPA, and (3) unfair. Richards's CUTPA claims are almost entirely duplicative of his contract claim. They are also without merit, and we affirm the district court's grant of summary judgment as to these claims.

**1**

"An act or practice is deceptive" under CUTPA if the defendant makes a material representation or omission likely to mislead consumers who "interpret the message reasonably under the circumstances." *Southington Sav. Bank v. Rodgers*, 668 A.2d 733, 736 (Conn. App. 1995) (quoting *Caldor, Inc. v. Heslin*, 577

A.2d 1009, 1013 (Conn. 1990)). "The deception standard is objective in nature,"

and a representation is deceptive only if it is "'likely' to mislead rather than merely

[has] the 'tendency or capacity' to do so." Langer, *et al.*, *supra*, § 2.3 (quoting

*Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 127 (1984) (Pertschuk, Comm'r,

concurring in part and dissenting in part)). A "failure to disclose can be

deceptive only if, in light of all the circumstances, there is a duty to disclose."

*Normand Josef Enters., Inc. v. Connecticut Nat'l Bank*, 646 A.2d 1289, 1307 (Conn.

1994).

Richards's deception claim is identical to his contract claim. He contends

that "reasonable consumers" would likely interpret the Evergreen clause to mean

that the variable rate would reflect "the costs of procuring power . . . plus an

appropriate margin to cover the legitimate costs and risks of supplying variable

rate customers." Reply Br. 4, 6 (quoting Confidential App. 44). But as explained

above, the contract unambiguously allowed Direct Energy to set the variable rate

the way it did. *See Murphy v. Provident Mut. Life Ins. Co. of Philadelphia*, 923 F.2d

923, 929–30 (2d Cir. 1990) (holding, in a case predicated on deceptive advertising,

that "[n]o deception can exist where, as here, the parties'" representations are

"clear[]"); *see also Hinchliffe v. Am. Motors Corp.*, 471 A.2d 980, 988 (Conn. Super.

Ct. 1982) (declining "to speculate that the public will place a patently absurd interpretation" on a representation).   Richards is also wrong, for the same reasons given above, when he claims that his experts' views about the Evergreen clause raise a question of fact on this issue.   Slapping the phrase "reasonable consumer" into his argument does not change our earlier analysis in any way.   *See Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) ("[A] court may determine as a matter of law that an allegedly deceptive [representation] would not have misled a reasonable consumer.").

Accepting Richards's argument to the contrary would mean, in effect, that if Direct Energy wished to retain the discretion in a contract to set its variable rate based on a range of business and market conditions, it was required to disclose every factor influencing that variable rate.   But CUTPA imposes no such duty. *See, e.g.*, *Kenney v. Healey Ford-Lincoln-Mercury, Inc.*, 730 A.2d 115, 117 (Conn. App. Ct. 1999) (holding that it is not a deceptive trade practice to fail to make certain disclosures unless the defendant has a preexisting duty to do so).   Connecticut, to be sure, requires consumer electricity contracts to explain "the rates that [] customer[s] will be paying, including the circumstances under which the rates may change."   Conn. Gen. Stat. § 16-245o(f)(2).   But PURA determined that the

25

Evergreen clause met this standard when it renewed Direct Energy's license. Requiring Direct Energy to define "business and market conditions" in greater detail would override PURA's certification. *Cf. Mead v. Burns*, 509 A.2d 11, 19 (Conn. 1986) (holding that CUTPA claims "that build[] upon the public policy embodied in specific statutory provisions . . . must be consistent with the regulatory principles established by the underlying statutes").

**2**

Richards's argument that Direct Energy's variable rate pricing constituted a *per se* violation of CUTPA is equally unavailing. As discussed above, Connecticut requires that "[e]ach contract for electric generation services [] contain all material terms of the agreement," including "a clear and conspicuous statement explaining the rates that [each] consumer will be paying" and "the circumstances under which the rates may change." Conn. Gen. Stat. § 16-245o(f)(2). An electric company that violates this provision commits a *per se* unfair or deceptive trade practice under CUTPA. *Id.* § 16-245o(j).

Richards contends that Direct Energy violated § 16-245o(j) because it "misrepresented that it set its variable rate based on 'business and market conditions' when it did not." Pl.-Appellant Br. 46. But Richards assumes, yet

again, that the Evergreen clause misrepresented Direct Energy's pricing practices. We have already rejected that view twice in this opinion.   We thus affirm the district court's grant of summary judgment on Richards's *per se* CUTPA claim.

**3**

Finally, Richards's claim that Direct Energy's variable rate pricing constituted an unfair trade practice under CUTPA is also without merit.   A trade practice is unfair under CUTPA if it (1) falls within "the penumbra of some common law, statutory, or other established concept of unfairness," (2) is "immoral, unethical, oppressive, or unscrupulous," or (3) "causes substantial injury to consumers . . . ."   *Votto v. Am. Car Rental, Inc.*, 871 A.2d 981, 984–85 (Conn. 2005).   The "substantial injury to consumers" prong covers conduct that is "substantial," is not "outweighed by any countervailing benefits," and causes "an injury that consumers themselves could not reasonably have avoided."   *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 579 A.2d 69, 77 (Conn. 1990) (emphasis removed) (quoting Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980)).

Richards's contentions do not come close to meeting this standard.   Run-of-the-mill statutory violations, torts, and contract breaches do not constitute

unfair trade practices. *See Jacobs v. Healey Ford-Subaru, Inc.*, 652 A.2d 496, 506 (Conn. 1995) (explaining that "the violation of a consumer statute" is not "an automatic violation of CUTPA" unless a statute "expressly" makes it so); *Ventres v. Goodspeed Airport, LLC*, 881 A.2d 937, 970 (Conn. 2005) (declining to "convert every trespass claim involving business property into a CUTPA claim"); *Metromedia Energy, Inc. v. Mansei, Inc.*, No. CV136041399S, 2014 WL 7495054, at *4 (Conn. Super. Ct. Nov. 3, 2014) (holding that "an ordinary breach of the contract" was not unfair under CUTPA). CUTPA thus prohibits only certain particularly abusive commercial practices. *See, e.g., A-G Foods*, 579 A.2d at 77 n.9 (recognizing the core of unfair practices as: "(1) withholding material information; (2) making unsubstantiated advertising claims; (3) using high-pressure sales techniques; and (4) depriving consumers of various post-purchase remedies" (quoting *Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 979 (D.C. Cir. 1985)); *Votto*, 871 A.2d at 985 (holding that charging credit cards without the cardholder's authorization is unfair under CUTPA).

The crux of Richards's unfairness theory is, once more, his contention that Direct Energy breached the contract by failing to tie its variable rate to "business and market conditions," which he interprets to mean procurement costs. *See* Pl.-

Appellant Br. 28 ("Richards'[s] claim is that [Direct Energy] acted in an 'unfair' manner by setting variable rates that *violate the terms of its contract* and do not fluctuate with 'business and market conditions.'").   But a "simple contract breach is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim." *Boulevard Assocs.*, 72 F.3d at 1039 (quoting *Chaspek Mfg. Corp. v. Tandet*, No. CV 9309-2714, 1995 WL 447948, at *12 (Conn. Super. Ct. June 16, 1995)).   So even if Richards had made out a contract claim — and he has not — this central feature of his CUTPA unfairness theory would be meritless.   *See Ramirez v. Health Net of Ne., Inc.*, 938 A.2d 576, 591 (Conn. 2008) (holding that a defendant did not violate CUTPA when it "availed itself of the rights afforded under the plain and unambiguous terms of [an] agreement").

Richards argues that his unfairness claim extends further and does not turn on his contract claim alone.   Specifically, he objects to Direct Energy's supposed practice of (1) "lur[ing]" consumers with "teaser-rates," and later (2) "goug[ing] [them] with variable rates" that (3) "consumers [do] not monitor."   Pl.-Appellant Br. 44.   In his view, these practices raise a question of fact as to whether Direct

Energy's pricing strategy was unfair. We consider each component of his argument in turn.

First, offering a teaser rate is not against public policy, unethical, or substantially injurious on its own, especially when, as here, consumers can cancel the contract whenever they like without paying any fee. *See A-G Foods*, 579 A.2d at 77 (holding that a trade practice does not cause a substantial injury under CUTPA if a consumer could have reasonably avoided it). Richards himself is a case in point as to why this is so: He chose to sign with Direct Energy *because* it offered the best fixed rate available. That *saved* him more than $100 over the Standard Service Rate during the first twelve months of his contract with Direct Energy — hardly a "substantial injury." *Votto*, 871 A.2d at 985.

Second, Richards's contention that the variable rates were so high that "no rational consumer" would voluntarily sign a variable rate contract, Reply Br. 5, is irrelevant for at least two reasons. First, he did not sign a variable rate contract; he signed a fixed rate contract that rolled over into a variable rate after a set time. As already noted, this at first saved him money, as compared to the Standard Service Rate, and ultimately cost him only about $1.67 per month above the Standard Service Rate during his time with Direct Energy. And regardless,

charging high prices does not on its own give rise to a CUTPA violation. *See, e.g.,* *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 566 F. Supp. 2d 81, 105 (D. Conn. 2008) (Droney, J.) ("[T]he plaintiffs have not shown that the Port Authority's imposition of an excessive passenger fee is an unfair trade practice by the preponderance of the evidence."). Even Richards concedes as much — several times. *See, e.g.,* Pl.-Appellant Br. 43 ("It is true that pricing practices "alone" may not give rise to a CUTPA unfairness claim."); *id.* at 45; Reply Br. 17.

Richards's unfair practices claim thus ultimately depends on his assertion that charging a variable rate that "consumers [do] not monitor" is a violation of CUTPA. Pl.-Appellant Br. 44. But he supplies no legal authority for this proposition. Presumably, what bothers Richards is that many Direct Energy consumers pay the variable rate when their initial fixed-rate periods expire, even though leaving their contracts would likely save them money. *See id.* at 44 (asserting that "no reasonable consumer . . . would remain enrolled in a [Direct Energy] variable rate plan"). But this is just an example of "status quo bias": a general tendency by people "to stick with their current situation." Richard H. Thaler & Cass R. Sunstein, *Nudge: Improving Decisions About Health, Wealth, and*

*Happiness* 34 (2008).   All sorts of companies design their business strategies with the expectation that consumers act this way.[8]   Many magazines and gyms, for example, offer initial discounts on subscriptions and membership on the assumption that they can make up the loss if customers either decide they like the product or, crucially, forget to cancel.[9]   And Connecticut law is clear that

---

[8] The core of the dissent's unfairness argument is thus similarly meritless. "People are inertial" and "not attentive," the dissent proclaims, *Dissenting Op.* at 7, 8, and therefore Direct Energy has violated the law by "exploit[ing] those consumer vulnerabilities," *id*. at 7 (citing Neil W. Averitt, *The Meaning of "Unfair Acts or Practices" in Section 5 of the Federal Trade Commission Act*, 70 Geo. L.J. 225 (1981)).   But the only "vulnerability" that Direct Energy has purportedly "exploited" is our basic tendency to be creatures of habit—a far cry from the targeting of traditionally "legally vulnerable" groups like children, the insane, the seriously ill, the bereaved, or the physically dependent, *see* Averitt, 70 Geo. L.J. at 256.   In our view, no reasonable jury could find the former tactic unfair under the circumstances presented here.

Nor can the dissent rely on the unfounded assertion that Direct Energy has engaged in "strategies to avoid alerting customers to their rising rates."   *Dissenting Op.* at 9.   That charge is baseless.   In a footnote, the dissent references a factual dispute about whether Direct Energy mailed notices to its consumers to notify them that their fixed rate periods would soon expire.   But whether Direct Energy took it upon itself to remind customers of the terms of the contracts that they themselves had willingly signed, nothing in the record suggests that Direct Energy erected any affirmative barriers to its customers exiting those contracts at will.   We reject the dissent's attempt to impose additional affirmative duties under the aegis of CUTPA, a maneuver that Connecticut courts have previously rejected.   *See Normand Josef Enters.*, 646 A.2d at 1307; *Kenney*, 730 A.2d at 117.

[9] *See, e.g.*, Richard H. Thaler & Cass R. Sunstein, *Nudge: Improving Decisions About Health, Wealth, and Happiness* 35 (2008) ("American Express wrote [Cass] Sunstein a cheerful letter telling him that he could receive, for free, three-month subscriptions to five magazines of his choice.   Free subscriptions seem like a bargain, even if the magazines rarely get read, so Sunstein happily made his choices.   What he didn't realize was that unless he took some action to cancel his subscription, he would continue to receive the

widespread business practices that are consistent with "common business norms" do not violate CUTPA. *Landmark Inv. Grp., LLC v. Calco Const. & Dev. Co.*, 60 A.3d 983, 992 (Conn. App. 2013).[10]   It is therefore clear to us that Direct Energy's pricing strategy during the term of its relationship with Richards was not against public policy, immoral, or substantially injurious.

At bottom, Richards signed a contract guaranteeing him a below-market rate, which he paid for twelve months.   For three months after that, he paid approximately two cents above the PURA-approved Standard Service Rate.   He then left the contract without penalty.   Richards now asks us to invalidate a PURA-approved contract that he chose after considering more than forty private options and the PURA-approved Standard Service Rate.   And he does so while

_____

magazines, paying for them at the normal rate.   For about a decade, he has continued to subscribe to magazines that he hardly ever reads.").

[10] In response, the dissent quotes a Connecticut Superior Court decision for the proposition that "[t]he fact that the defendant's practice is standard in the industry . . . does not excuse it as a violation of CUTPA." *Dissenting Op.* at 3 (quoting *Halloran v. Spillane's Servicenter, Inc.*, 41 Conn. Supp. 484, 500 (Conn. Super. Ct. 1990)).   But this comparison ignores the substantial daylight between a standard practice within a *single* industry and common business norms across *many* industries.   *Halloran* involved a towing company's refusal to release a vehicle owner's personal possessions before payment of all fees connected with the towing service, *id.* at 488—apparently a common practice within the Connecticut towing business at the time, *id.* at 500.   That conduct bears no analogy to quotidian pricing practices like Direct Energy's, which have long been mainstream across numerous sectors of American commerce.

conceding that Direct Energy's pricing practices were akin to those of its competitors.   *See* Reply Br. 17 n.12 (characterizing the private electricity market as a "corrupt industr[y]").   But Connecticut chose to *deregulate* consumer electricity ratemaking, not transfer that authority from a public utility commission to the after-the-fact judgments of courts interpreting CUTPA.   *See Mead*, 509 A.2d at 19 (holding that CUTPA claims "that build[] upon the public policy embodied in specific statutory provisions . . . must be consistent with the regulatory principles established by the underlying statutes"); *see also* Conn. Gen. Stat. § 42-110c (prohibiting suits under CUTPA for "actions otherwise permitted under law as administered by any regulatory board").   We therefore conclude that Richards's CUTPA claim is without merit and that the district court's partial grant of summary judgment as to this claim should be affirmed.

## II

Richards next challenges the district court's dismissal of his unjust enrichment and Massachusetts state law claims.   We review *de novo* a district court's dismissal on the pleadings, "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff."   *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).   "To

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## A

The district court held that Richards failed to state a claim for unjust enrichment because he signed a contract with Direct Energy. *See also Meaney v. Connecticut Hosp. Ass'n, Inc.*, 735 A.2d 813, 823 (Conn. 1999) ("[A]n express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter." (quoting 1 E. Farnsworth, *Contracts* § 2.20 (2d ed. 1998)). Richards contends that this was error. He agrees with the district court that he and Direct Energy had an enforceable contract in principle. But he argues in the alternative that if this contract did not "prevent [Direct Energy's] predatory conduct, then the contract [was] illusory[,] and [he] is entitled to recovery under unjust enrichment." Reply Br. 31–32. We disagree.

The contract was not illusory. The implied covenant of good faith and fair dealing obliged Direct Energy to act in good faith when it set the variable rate, and "good faith is enough to avoid the finding of an illusory promise." *Sicaras v. City*

35

*of Hartford*, 692 A.2d 1290, 1297 (Conn. App. Ct. 1997) (quoting 2 A. Corbin, *Contracts* § 5.28 (Rev. Ed. 1995)).   Because Richards and Direct Energy had a binding contract, Richards could not plead an unjust enrichment claim.   We therefore affirm the district court on this issue.

## B

Finally, we turn to Richards's unfair trade practices claims under Massachusetts law.   The district court dismissed these claims for lack of Article III standing because Richards was not injured in Massachusetts.   This was error. A plaintiff has Article III standing if he suffered (1) an injury, (2) caused by the defendant that (3) would be redressed by a favorable judicial decision.   *See, e.g.,* *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012).   There is no question that Richards satisfies this standard: he was (1) charged money, (2) by Direct Energy, and (3) seeks recompense for this charge.   To be sure, whether a statute grants a plaintiff a cause of action will often turn on where the tortious conduct occurred.   *See, e.g., Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) ("[T]o ask what conduct [a statute] reaches is to ask what conduct [that statute] prohibits, which is a merits question.").   But "the absence of a valid . . . cause of action does not implicate" Article III standing.   *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)).

We still affirm the district court's dismissal of Richards's Massachusetts claims, however, because dismissal was proper under Federal Rule of Civil Procedure 12(b)(6). *See Sharkey v. Quarantillo*, 541 F.3d 75, 92 (2d Cir. 2008) ("Although the district court erroneously dismissed the action pursuant to Rule 12(b)(1), we could nonetheless affirm the dismissal if dismissal were otherwise proper based on failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). Here, Richards failed to state a claim because Massachusetts does not give plaintiffs a cause of action for unfair or deceptive acts that "occur[] outside" Massachusetts. *Skyhook Wireless, Inc. v. Google Inc.*, 19 N.E.3d 440, 449 (Mass. App. Ct. 2014). Beyond this statutory hurdle, the United States Constitution would also bar Massachusetts from regulating, via consumer protection law, the rates that Direct Energy charged consumers in Connecticut. *See, e.g., Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 528 (1935) (holding that the Dormant Commerce Clause prohibits one state from "establish[ing] . . . a scale of prices for use in other states"); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003)

37

(holding that a state may not "punish a defendant for conduct that may have been lawful where it occurred").

Richards does not challenge any of this on appeal but instead argues that he has "'class standing' . . . to assert claims *on behalf of*" Direct Energy's Massachusetts customers, even if he cannot *personally* assert any claims under Massachusetts law. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158 (2d Cir. 2012).   But the district court's August 4, 2015 decision was not to the contrary. The court held merely that Richards could not sue *on his own behalf* under Massachusetts law; it did not opine on whether a plaintiff asserting claims under Connecticut law could *represent* a class of consumers asserting claims under Massachusetts law.   The court never had cause to reach the latter issue because it never addressed the issue of class certification.   Instead, it dismissed Richards's motion for certification as moot in March 2017 because he no longer had any viable claims under Connecticut law.   Richards does not challenge this dismissal on appeal.

Accordingly, we have no occasion to address whether Article III would have prevented Richards from representing a class of plaintiffs with claims under Massachusetts law.   *But see Langan v. Johnson & Johnson Consumer Companies, Inc.*,

No. 17-1605, 2018 WL 3542624, at *6 (2d Cir. July 24, 2018) (holding that "whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III"). We therefore affirm the district court's August 4, 2015 partial dismissal as to the Massachusetts claims.

## CONCLUSION

We have considered each of Richards's remaining arguments and have determined them to be without merit. Accordingly, the judgment of the district court is AFFIRMED.

POOLER, *Circuit Judge*, concurring in part and dissenting in part:

Direct Energy sucked customers in with an appealing teaser rate only to later jack up the cost when those customers would not notice. The temptation of this siren-like path was no accident. Direct Energy created "glide paths" to ensure customers were lulled into inattentiveness. It ramped up rates for those who were inattentive to begin with. And then it capitalized on its customers' lack of awareness. I am convinced that a jury could reasonably conclude that this pricing practice is unfair. Accordingly, I dissent from the majority's conclusion that Direct Energy did not commit an unfair practice or breach its contract with its customers. However, I concur that Direct Energy did not, as a matter of law, engage in deceptive practices, commit a per se CUTPA violation, or breach any implied contract.

Utility deregulation initially promised that introducing competition would make electricity and gas service more reliable at lower prices, perhaps even encouraging green energy alternatives. Those hopes have run up against unforeseen realities. *See generally Electricity Deregulation: Choices and Challenges* 145 (James M. Griffin & Steven L. Puller eds., 2005). This suit is one of a wave of cases to hit the courts alleging that electricity providers like Direct Energy are

manipulating their pricing structures to enable them to charge well more than the regulated rate for the same service without their customers' noticing. Competition cannot deliver its advertised benefits when businesses subvert consumer choice in this way. When the legislature has given courts tools to address such abuses, we should not shy away from using them with the expectation that the market will work itself out. Doing so relies on our hopes for, rather than the reality of, market competition.

A reasonable jury could easily conclude that at least part of Direct Energy's business model was to predict, encourage, and profit off of its customers' inattention. Direct Energy does not dispute that it set its variable rates as high as it possibly could without attracting the attention of its customers. That includes setting higher rates for a subset of customers who would be less likely to notice and creating "glide paths" to make all of its customers less likely to notice. A reasonable jury could also conclude that the letter and spirit of Direct Energy's boilerplate contract language did not allow for those pricing practices.

## A. Unfairness under CUTPA

Connecticut courts "have adopted the criteria set out in the cigarette rule by the Federal Trade Commission for determining when a practice is unfair [under

CUTPA]: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors, or other businesspersons." *Landmark Inv. Grp., LLC v. Calco Constr. and Dev. Co.*, 318 Conn. 847, 880 (2015) (brackets omitted).

The majority errs in finding "Connecticut law ... clear that widespread business practices that are consistent with 'common business norms' do not violate CUTPA." Majority op. at 32 (quoting *Landmark Inv. Grp., LLC v. Calco Constr. and Dev. Co.*, 141 Conn. App. 40, 55 (Conn. App. 2013)). To the contrary: in Connecticut, "[t]he fact that the defendant's practice is standard in the industry ... does *not* excuse it as a violation of CUTPA." *Halloran v. Spillane's Servicenter, Inc.*, 41 Conn. Supp. 484, 500 (Conn. Super. Ct. 1990) (emphasis added). "Common business norms" are to be considered at most as part of a court's determination of whether the criterion of unscrupulousness is satisfied, not as dispositive evidence of what is and is not unfair.

That a business practice has "not previously [been] considered unlawful" cannot be considered a defense, as the purpose of unfairness doctrine is "to create a new body of law … adapted to the diverse and changing needs of a complex and evolving competitive system." *In re Pfizer Inc.*, 81 F.T.C. 23, 28 (1972); *see also Sperry & Hutchinson*, 405 U.S. 233, 244 (1972) (comparing the FTC to a "court of equity"). My colleagues suggest that in Connecticut unfairness is a rarity and "the core of unfair practices [is]: 'withholding material information; (2) making unsubstantiated advertising claims; using high-pressure sales techniques; and (4) depriving consumers of various post-purchase remedies.'" Majority op. at 28 (citing *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 216 n.9) (Conn. 1990) (quoting *Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 979 (D.C. Cir. 1985)). But neither Connecticut law nor unfairness jurisprudence more generally has restricted the doctrine to those categories.[1] And more recent FTC enforcement

---

[1] Those categories were identified in 1981 by an FTC staffer as an effort to "catalogu[e] some of the most common commercial practices whose unfairness … has already been litigated and established" up to that point and *not* to "settle any controversy about how [unfairness] ought to be used." Richard Craswell, *The Identification of Unfair Acts and Practices by the Federal Trade Commission*, 81 Wisc. L. Rev. 107, 108-09 (1981). The D.C. Circuit referred to them in considering the meaning of "unfairness"—correctly identifying them as emanating from an "article authored by a member of the [FTC's] Office of Planning," rather than the FTC itself. *Am. Fin. Servs. Ass'n*, 767 F.2d at 979. Connecticut's Supreme Court quoted the D.C. Circuit decision in a footnote of just one of its decisions, incorrectly identifying the categories as promulgated by the FTC and never suggesting that they restricted the universe of unfair practices. *A-G Foods, Inc.*, 216 Conn.

actions—targeting data privacy breaches, for instance—suggest that unfairness doctrine continues to evolve beyond the purported "core" my colleagues identify. *Cf., e.g., F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) (upholding an FTC enforcement against a hotel chain that had extremely lax cybersecurity protecting its customers' financial and personal identifying information).

Here, a reasonable jury could conclude that Direct Energy's pricing strategy was an unfair practice. "Whether a practice is unfair and thus violates CUTPA is an issue of fact." *Landmark*, 318 Conn. at 881 (brackets and internal quotation marks omitted). Accordingly, our task at this stage is not to determine whether Direct Energy's practices were unfair or not. Instead, the grant of summary judgment should be affirmed only if it can be concluded that no reasonable jury could find Direct Energy's practices were unfair on any of the cigarette rule's criteria.

The FTC considers the third prong of the cigarette test—sometimes called "unjustified consumer injury"—as "the primary focus of the FTC Act." Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), *available at* http://www.ftc.gov/bcp/policystmt/ad-unfair.htm ("FTC Policy Statement").

---

at 216 n.9.

Following the Connecticut legislature's directive to be "guided by interpretations given by the Federal Trade Commission and the federal courts to [the FTC Act]," Conn. Gen. Stat. § 42-110b(b), the Connecticut Supreme Court has acknowledged that unjustified consumer injury is "the most important of the three … criteria" in the cigarette rule, *A-G Foods, Inc.*, 216 Conn. at 215-16 (internal quotation marks omitted).

Connecticut courts have also adopted the FTC's guidance that an "injury must satisfy three tests" to be considered unfair: "[1] [i]t must be substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury that consumers themselves could not reasonably have avoided." *Id.* at 216 (quoting FTC Policy Statement, *supra*) (emphasis removed). The majority deems Richards's individual harm insubstantial, but that misses the point. For an injury to be substantial, "it need not take the form of a single crushing loss." Neil W. Averitt, *The Meaning of "Unfair Acts or Practices" in Section 5 of the Federal Trade Commission Act*, 70 Geo. L.J. 225, 246 (1981). Instead, "[a] recognizable harm may be one that does great injury to a small number of people, or small injury to a great number of people." *Id.* Here, Richards purports to represent a class of consumers who, in the aggregate, have

lost $11.2 million—plainly a substantial injury.[2]

Though the majority asserts that we should categorically exclude the possibility that "offering a teaser rate" is "substantially injurious on its own, especially when, as here, consumers can cancel the contract whenever they like without paying any fee," Majority op. at 30, they offer no good reason why that should be so. As they acknowledge, the mere fact that a customer can opt out of an auto-renewing contract at any time without breaching it does not mean that the customers will do so when it is in their interest. People are inertial. The same people who spend hours comparing electricity prices (or credit card rates or online streaming services or magazine subscriptions or gym memberships) are quite unlikely to maintain that level of vigilance once they have habitually received and paid for electricity (or other goods or services) for months or years on end. Unfairness doctrine is designed to police such circumstances when businesses exploit those consumer vulnerabilities. *Cf.* Averitt, *The Meaning of "Unfair Acts or*

---

[2] This number represents the amount of money Direct Energy made on its variable-rate customers less the amount of money it would have made if it had added the same mark-up it does for its fixed-rate customers (which Direct Energy itself referred to as its "benchmark" profit margin). In other words, it takes into account the costs Direct Energy actually paid and the mark-up it uses in its own accounting. It does *not*, contrary to my colleagues' suggestions, represent the amount by which Direct Energy's variable rate prices exceed the regulated rate. That amount is $29 million—or nearly three times as much.

*Practices*", 70 Geo. L.J. at 251-52 ("An unfairness action … will be appropriate only when the respondent's methods have undermined the ability of consumers to protect themselves."). A business that designs its price structure so that those who are not attentive pay significantly more than they would if they were attentive is fairly characterized as causing unjustified consumer injury. Direct Energy does not dispute that it set variable rates as high as it could without attracting the attention of customers whom it knew would be paying little attention or that, if its customers had been paying attention, they would have been better off. A jury should decide if such practice is unfair.

The majority notes that Richards saved money during the teaser/fixed rate period of the contract relative to those who paid the regulated rate—something that seems to be true of many of Direct Energy's customers. But that fact is entirely consistent with Richards's theory of the case: Direct Energy undercut other suppliers' prices to lure customers in, knowing that it could overcharge them once they had been customers long enough. In other words, had Richards not saved during the fixed term, Direct Energy would never have been able to overcharge. That it took only three months of inattention after the fixed rate's expiration to

vitiate a full year's worth of savings provides support for Richards's theory.[3]

A jury could reasonably find that Direct Energy's strategies to avoid alerting customers to their rising rates,[4] together with predictable consumer inertia, imply that consumers could not reasonably avoid paying the higher rates. Only those who are most anxious about money or most scrupulous about their affairs are likely to pay close attention to the rate they are charged for energy (rather than the gross amount, which varies seasonally and may be due to one's own changes in energy use) and to engage in monthly price comparisons of this rate.

The majority reasons that the fact that "Connecticut chose to *deregulate* consumer electricity ratemaking" suggests that it did not seek to "transfer that authority from a public utility commission to the after-the-fact judgments of courts

---

[3] The majority harps on the fact that Richards's rate was around "two cents above the PURA-approved Standard Service Rate" when his variable-rate contract kicked in. Majority op. at 33. That is a misleading way to put it. We have to take scale into account: the Standard Service Rate during this period was around eight cents per kilowatt hour. Two cents above the Standard Service rate is thus 125% of the Standard Service Rate. By comparison, Richards's fixed rate price of $.0745 only saved him approximately one half a cent per month, or 6% of the Standard Service Rate.

[4] Direct Energy claims that it sent notices in the mail to its customers indicating that the fixed rate period was about to expire, although Connecticut's electricity regulator, PURA, made a finding in 2015 that Direct Energy had failed to do so in at least some cases. *See Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 555-56 (D. Conn. 2017). Even if Direct Energy did send such notices to all of its customers, it clearly could have done more if it truly wanted them to switch back to a fixed-rate plan.

interpreting CUTPA." Maj. op. at 33. But to infer the latter from the former is to overread the meaning of "deregulate." As it is used in the context of electricity (and other utilities), "deregulation" is shorthand only for a state's decision to allow more than one company to sell electricity to its residents. Electricity provision is still highly regulated: public utilities still own and operate the physical infrastructure (i.e. the wires, poles, transformers, etc.) subject to state regulation; only licensed companies can use this infrastructure to provide electricity; those companies are required to make a number of disclosures and to meet several state-promulgated standards; electricity markets largely take place on exchanges created, managed, and regulated by the state; the prices electricity companies charge are affected by the fact that they have to compete with the still-regulated rates of the public utilities; etc. A state that chooses to regulate its electricity provision in part through managed competition does not retreat from any regulation whatsoever.

### B. Good Faith and Breach of Contract

I also disagree with my colleagues that "Richards's CUTPA claims are almost entirely duplicative of his contract claim." Maj. op. at 23. Even if Direct Energy reserved itself absolute discretion in the contract, it is reasonable for a jury

to conclude that it took advantage of its customers. I now turn to whether Direct

Energy's contract permitted it to set prices in the way it did. A reasonable jury

could conclude that the contract did not enable Direct Energy's practices.

First, it is not a foregone conclusion that cross-subsidization, pegging prices

to competitors', and price smoothing are pricing strategies that are "based upon

business and market conditions." Maj. op. at 18. The majority concludes that since

any condition Direct Energy faces is either a "business condition" or a "market

condition," Direct Energy has effectively granted itself unmitigated discretion to

set prices. If its customers don't like the price they are getting, the majority reasons,

those customers can leave.

Just as reasonable, though, is the interpretation that the phrase "business

and market conditions" only includes those conditions that affect Direct Energy's

costs of providing electricity. On this reading, "business conditions" refers to

relatively fixed costs of labor, facilities, legal representation, and the like, while

"market conditions" refers to the more variable cost of purchasing electricity and

electricity derivatives. *Cf. Mirkin v. Viridian Energy, Inc.*, No. 15-cv-1057, 2016 WL

3661106, at *8 (D. Conn. July 5, 2016) (discussing a contract that included "a

variable rate based on wholesale market conditions" as a basis to find a breach

when prices were not set based on wholesale prices); *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 143 (D. Conn. 2015) ("While the text of the contract itself does not indicate that NAPG prices would definitively or precisely be linked with the wholesale market price, with or without the marketing materials, it is plausible that a reasonable consumer would infer a direct link between the two."); *Claridge v. N. Am. Power & Gas, LLC*, No. 15-cv-1261, 2015 WL 5155934, at *4-6 (S.D.N.Y. Sept. 2, 2015) (finding bad faith on a contract that guaranteed "variable market rates" according to an unspecified formula). Direct Energy notified consumers that its variable rates would be calibrated to pass on its costs—i.e. there would be risk-sharing—but did not place customers on notice that it would set prices in whatever matter it calculated to be most profitable.

In Connecticut, "[w]hen the language of a contract is ambiguous, the determination of the parties' intent is a question of fact" to be submitted to a jury. *Gabriel v. Gabriel*, 324 Conn. 324, 341 (2016). "In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." Restatement (Second) of Contracts § 206; *see also* Williston on Contracts § 32:13 (4th ed. 2017). A reasonable juror could find that

Direct Energy tied its price-setting discretion to its cost of doing business. *Cf. Silvis v. Ambit Energy L.P.*, 674 F. App'x 164, 168 (3d Cir. 2017) (finding that a clause that permitted price to "vary dependent upon price fluctuations in the energy and capacity markets" was ambiguous because it was unclear whether the phrase "may vary" afforded the electricity supplier complete discretion in setting rates, or whether that discretion was limited by the clause "dependent upon price fluctuations in the energy and capacity markets").

Under Connecticut law, when a contract gives one party discretion to determine how to render performance on an open-ended term, "it is axiomatic that the duty of good faith and fair dealing" is read into the contract to cabin that discretion and avoid rendering the obligation illusory. *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004) (internal punctuation and quotation marks omitted). "The majority of courts have held that subjective bad faith is irrelevant" and that a seller who objectively does not "charge commercially reasonable amounts" or who "discriminate[s] among its purchasers" fails to act in good faith. *Marcus Dairy, Inc. v. Rollin Dairy Corp.*, No. 05-cv-589, 2008 WL 4425954, at *8 (D. Conn. Sept. 24, 2008) (internal quotation marks omitted). In Connecticut, "a neglect or refusal to fulfill some duty … not prompted by an honest mistake as

to one's rights or duties, but by some interested or sinister motive" may suffice to demonstrate bad faith. *De La Concha*, 269 Conn. at 433 (quoting *Habetz v. Condon*, 224 Conn. 231, 237 (1992)).

Whether a party has acted in good faith or not is a question of fact for the jury. *See Renaissance Mgmt. Co. v. Conn. Housing Fin. Auth.*, 281 Conn. 227, 240-41 (2007). The facts on this record would allow a jury to conclude that Direct Energy's pricing practices undermined the legitimate expectations[5] set by the contract. It is uncontested that Direct Energy set monthly variable rate prices for reasons other than passing on the cost of providing electricity for that month. It raised variable-rate prices to recoup anticipated losses among fixed-rate customers, and it smoothed variable-rate prices so that customers would not notice how high they were getting. A jury should determine whether Direct Energy's reasons amounted to bad faith or a breach of the contract given the letter and spirit of the contract—a question this Court should not answer in the jury's place. *Cf. Edwards*, 120 F. Supp. 3d at 147 ("While the contract left the price open to be set at NAPG's

---

[5] Consumers' expectations about the meaning of a term in the fine print of an adhesive contract are nearly always legal fictions, but the law is clear that they are fictions on which we are to rely. One recent suggestion to tether these fictions to reality is the admission of survey evidence on what particular passages mean. *See* Omri Ben-Shahar & Lior Jacob Strahilevitz, *Interpreting Contracts via Surveys and Experiments*, 92 N.Y.U. L. Rev. 1753 (2017).

discretion with certain limitations, the covenant of good faith and fair dealing mandates that NAPG exercise that discretion reasonably by charging a commercially reasonable price.").

## C. Dismissal of Massachusetts Claims

Another panel of this Court recently rejected the rationale supporting the district court's dismissal of Richards's Massachusetts-based claims for lack of standing:

> in *Richards v. Direct Energy Servs., LLC*, the district court concluded that a Connecticut plaintiff that alleged that the defendant energy company had attracted customers with misleading promises of low rates lacked standing to sue on behalf of Massachusetts consumers who were injured by the same defendant. 120 F. Supp. 3d at 151. The court reasoned that "[w]ithout an allegation that [the named plaintiff] personally was injured in Massachusetts," the plaintiff's claim was essentially that, like the plaintiffs in Massachusetts, he had "suffered in some indefinite way in common with people generally." *Id.* at 155 (internal quotation marks and alteration omitted). This reasoning falters upon its premise: the harm the plaintiff alleged was not a general grievance common to people generally; it was a specific grievance based on the defendant's falsely advertised rates, suffered by specific people (Connecticut and Massachusetts customers of the defendant), under a specific set of circumstances. *See id.* We fail to see how the fact that the defendant's wrongful conduct impacted customers in two states rendered the injuries of the Massachusetts consumers somehow more indefinite than the identical injuries of the Connecticut consumers.

*Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 96 (2d Cir. 2018). The question of "whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III." *Id.* I would remand this case to the district court to determine, under Rule 23, whether a class should be certified and whether it should include Massachusetts consumers.

In sum, I would vacate the district court's grant of summary judgment with respect to the unfairness and contract claims and remand for consideration of class certification in the first instance.